# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT F. KENNEDY CENTER FOR JUSTICE AND HUMAN RIGHTS, <br>    1300 19th Street NW, Suite 750 <br>    Washington, DC 20036, <br><br> AMERICAN IMMIGRATION COUNCIL, <br>    PMB2026, <br>    2001 L Street NW, Suite 500 <br>    Washington, DC 20036, <br><br> THE DOOR – A CENTER OF ALTERNATIVES, INC., <br>    121 Avenue of the Americas <br>    New York, NY 10013, <br><br> and <br><br> LEAGUE OF UNITED LATIN AMERICAN CITIZENS INSTITUTE, INC., <br>    1150 18th Street NW, Suite 275 <br>    Washington, DC 20036, <br><br>        *Plaintiffs*, <br><br>            v. <br><br> LINDA MCMAHON, in her official capacity as Secretary of the Department of Education, <br>    400 Maryland Avenue SW <br>    Washington, DC 20202, <br><br> and <br><br> UNITED STATES DEPARTMENT OF EDUCATION <br>    400 Maryland Avenue SW <br>    Washington, DC 20202, <br><br>        *Defendants*. | Case No. 25-3860 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. In 2007, Congress amended the Higher Education Act (HEA) to create the Public Service Loan Forgiveness Program (PSLF) and encourage students to pursue public service jobs after graduation from college and graduate school. *See* 20 U.S.C. § 1087e(m) (PSLF statute).

2. Under PSLF, the Department of Education forgives the remaining balance of federal student loans for borrowers who spend ten years repaying those loans while working in jobs in the public interest. Congress specified that borrowers "employed in a public service job" would be eligible for loan forgiveness under PSLF, 20 U.S.C. § 1087e(m)(1)(B), and defined a "public service job" as "a full-time job" in any of sixteen categories, including emergency management, government (excluding time served as a member of Congress), military service, public safety, law enforcement, public health, public education, certain types of social services, public interest law services, early childhood education, and library sciences, *id.* § 1087e(m)(3)(B). The PSLF statute also provides that positions at nonprofit organizations exempt from taxation under section 501(c)(3) of the Internal Revenue Code are "public service job[s]" qualifying for loan forgiveness. *Id.*

3. Congress did not delegate authority to the Department of Education to exclude borrowers who work in public service jobs from PSLF or to narrow the statutory definition of "public service job."

4. In a final rule published on October 31, 2025, however, Defendants Linda McMahon and the U.S. Department of Education (collectively, the Department) amended the regulations governing PSLF to exclude from qualifying employment public service jobs with "employers that engage in specific enumerated illegal activities such that they have a substantial illegal purpose." William D. Ford Federal Direct Loan (Direct Loan) Program, 90 Fed. Reg. 48966 (Oct. 31, 2025) (hereafter, the Rule). Under the Rule, the Department will deem an employer to

2

have a "substantial illegal purpose" if it engages in activities including "aiding or abetting violations of … Federal immigration laws," "[e]ngaging in a pattern of aiding and abetting illegal discrimination" under federal (but not state) anti-discrimination law, and providing gender-affirming care to individuals under the age of 19 "in violation of Federal or State law." *Id.* at 49001. The Rule also establishes a system by which the Department of Education will itself adjudicate an employer's compliance with any of the implicated federal or state laws. *Id.* at 49002. The Rule states that the Secretary will consider "the materiality of any illegal activities or actions" in deciding whether to exclude an employer from PSLF eligibility. *Id.* The preamble indicates that even a single act can be sufficiently material to conclude that the organization as a whole has a substantial illegal purpose. *Id.* at 48988.

5. The Rule's vague language, as well as its application of criminal-law concepts of aiding and abetting to inapposite civil-law immigration and discrimination contexts, leave non-profit employers without guidance to know what activities or forms of advocacy could trigger exclusion from PSLF and the stigma of being declared by the federal government to have a "substantial illegal purpose." The Rule will make it more difficult for employers in certain fields, such as advocacy on behalf of immigrants, to recruit and retain employees, and will chill politically disfavored but legal activities by PSLF employers.

6. The Rule is contrary to the PSLF statute, exceeds the Department's regulatory authority, and violates the constitutional rights of nonprofits whose employees are statutorily eligible for PSLF (PSLF-eligible employers). Plaintiffs bring this action asserting violations of the Administrative Procedure Act (APA) and the First and Fifth Amendments of the Constitution to stop this unlawful regulation from taking effect and to ensure that employers are able to use PSLF to recruit and retain a workforce with the benefits Congress intended.

## JURISDICTION AND VENUE

7. This Court has jurisdiction under 28 U.S.C. § 1331.

8. Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(A) because Defendants are officers and agencies of the United States and at least one Defendant resides in this district.

## PARTIES

9. Plaintiff Robert F. Kennedy Center for Justice and Human Rights d/b/a Robert F. Kennedy Human Rights (RFK Human Rights) is a section 501(c)(3) tax-exempt organization. Founded in 1968 to accomplish Senator Robert F. Kennedy's vision for a more just and peaceful world, RFK Human Rights advocates for human rights issues in the courtroom, in the boardroom, and in the classroom. It litigates immigration cases to achieve systemic change, investigates and exposes immigration-related abuses, and educates the public and policymakers on human rights abuses that occur in the immigration system. It convenes, educates, and mobilizes a global network of investors and corporations to address inequality as a systemic risk and to build a more just, inclusive, and equitable economy and society for the future. And it educates students about human rights and trains the next generation of leaders. RFK Human Rights actively seeks to recruit and maintain a workforce that is reflective of the population it serves.

10. Plaintiff American Immigration Council (The Council) is a section 501(c)(3) tax-exempt organization. The Council works to advance positive public attitudes and create a more welcoming America that provides fair process for immigrants through litigation, research, legislative and administrative advocacy, and communications. The Council coordinates efforts to vigorously defend immigrants facing removal, brings lawsuits to stop harmful immigration policies, protect the legal rights of noncitizens, and hold the government accountable for unlawful conduct; intentionally uses communications strategies to affect the way people act toward

immigrants and immigration; and sponsors interns and trainees who participate in business-focused cultural exchange programs.

11. Plaintiff The Door – A Center of Alternatives, Inc. (The Door) is a section 501(c)(3) tax-exempt organization. The Door provides comprehensive services to youth aged 12–24 in New York City, including primary and reproductive health care, gender affirming care, mental health services, legal assistance, college preparation, career development, housing support, arts, recreational activities, and nutritious meals—all for free and in a caring environment. The Door's Legal Services Center provides a full range of civil legal services, including in immigration matters. At The Door, youth can access a continuum of wraparound supports, including health care through its Adolescent Health Center, regardless of their immigration status.

12. Plaintiff L.U.L.A.C. Institute, Inc., (LULAC) is a section 501(c)(3) tax-exempt organization. LULAC's mission is to advance the economic condition, educational attainment, political influence, housing, health, and civil rights of the Hispanic population of the United States. LULAC runs a wide range of local, state, and national programs to meet the needs of the 62–65 million Latinos living and working in the United States. These include women's empowerment programs, civic engagement programs that serve the immigrant community, and health programs designed to address health disparities faced by Latinos in the United States and Puerto Rico.

13. Defendant Linda McMahon is the Secretary of Education and is sued in her official capacity.

14. Defendant U.S. Department of Education is an agency of the United States.

## BACKGROUND

**The PSLF Statute**

15. In 2007, Congress, recognizing that the skyrocketing cost of higher education made it nearly impossible for public servants to obtain the degrees required to serve in their professions and pay back their resulting student loans, enacted the College Cost Reduction and Access Act on a bipartisan basis, amending the HEA and creating PSLF. Pub. L. No. 110-84, § 401, 121 Stat. 784, 800–01 (2007). PSLF "is intended to encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their Direct loans," *i.e.*, student loans issued by the Department under Title IV of the HEA, "after they satisfy the [program's] public service and loan payment requirements." 34 C.F.R. § 685.219(a). It assists students who want "to pursue a career in public service and [to] be able to take those jobs … often[] at lower pay" by "reliev[ing] them[] of the huge burden of debt they face."[1]

16. PSLF benefits both borrowers and nonprofit employers, like Plaintiffs, who are aiming to build a workforce, retain talent, and often compete with employers in the private, for-profit sector. PSLF operates as a subsidy to employers, by providing employees a valuable loan repayment benefit at no cost, freeing up financial resources that can then be spent on expanding programs. "By design, then, the PSLF statute facilitates a public service organization's recruitment of employees by decreasing their employees' long-term debt burden. This debt relief reduces pressure on public service organizations to raise salaries." *Am. Bar Ass'n v. United States Dep't of Educ.*, 370 F. Supp. 3d 1, 19 (D.D.C. 2019).

---

[1] 153 Cong. Rec. S11,245 (daily ed. Sept. 7, 2007) (statement of Sen. Sherrod Brown).

17.　　To provide these benefits to borrowers and their employers, Congress mandated that the Secretary "shall cancel the balance of interest and principal due … on any eligible Federal Direct Loan not in default for a borrower who[:]

> (A) 　has made 120 monthly payments on the eligible Federal Direct Loan after October 1, 2007, pursuant to [one of several enumerated loan repayment plans] … ; and
>
> (B)
>
> > (i) 　is employed in a public service job at the time of such forgiveness; and
> >
> > (ii) 　has been employed in a public service job during the period in which the borrower makes each of the 120 payments described in subparagraph (A)."

20 U.S.C. § 1087e(m)(1).

18.　　Congress defined "public service job" to include employers who are engaged in certain enumerated types of work. It also included other employers, regardless of the subject matter of their work, if the organization is recognized as exempt from taxation by the IRS under section 501 of the Internal Revenue Code. In full, the PSLF statute defines "public service job" as:

> (i) 　a full-time job in emergency management, government (excluding time served as a member of Congress), military service, public safety, law enforcement, public health (including nurses, nurse practitioners, nurses in a clinical setting, and full-time professionals engaged in health care practitioner occupations and health care support occupations, as such terms are defined by the Bureau of Labor Statistics), public education, social work in a public child or family service agency, public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization), early childhood education (including licensed or regulated childcare, Head Start, and State funded prekindergarten), public service for individuals with disabilities, public service for the elderly, public library sciences, school-based library sciences and other school-based services, *or at an organization that is described in section 501(c)(3) of Title 26 and exempt from taxation under section 501(a) of such title*; or
>
> (ii) 　teaching as a full-time faculty member at a Tribal College or University as defined in section 1059c(b) of this title and other faculty teaching in high-needs subject areas or areas of shortage (including nurse faculty, foreign

>    language faculty, and part-time faculty at community colleges), as determined by the Secretary.

*Id.* § 1087e(m)(3)(B) (emphasis added).

19. By regulation, the Department has established an application process for PSLF loan forgiveness. *See* 34 C.F.R. § 685.219. After making 120 monthly qualifying payments on eligible loans, the borrower may request loan forgiveness by filing an application approved by the Secretary. *Id.* § 685.219(e). That form includes an "Employer Certification" section that requires the employer to certify its Employer Identification Number (EIN), name, and address, the borrower's dates of employment, whether the borrower worked full-time or part-time, and the average hours worked per week.[2]

20. PSLF works. Members of Congress report that, according to their constituents, "PSLF has transformed their workplaces. It helps recruit and retain top talent, making workforces more efficient" and "provides the financial feasibility [borrowers] need to dedicate their careers to serving our communities in a public service capacity."[3]

21. The impact of PSLF on employers is significant. According to one study, more than 96 percent of nonprofits with paid employees have been able to expand their workforce because

---

[2] *See* https://studentaid.gov/sites/default/files/public-service-application-for-forgiveness.pdf.

[3] *See* Letter from Brian Fitzpatrick (R-PA) and 12 other Republican lawmakers to the Chairwoman of the House Committee on Education and the Workforce (Apr. 18, 2018), available at https://www.insidehighered.com/sites/default/files/media/PSLF%20Letter%20to%20House%20Leadership.PDF.

of PSLF.[4] As an author of that study explained, "the passage of the PSLF was associated with nonprofits being better able to fulfill their missions in the communities they serve."[5]

**The Administration's Attack on PSLF**

22. On March 7, 2025, President Trump issued an Executive Order titled "Restoring Public Service Loan Forgiveness." Executive Order 14235, 90 Fed Reg. 11885 (Mar. 7, 2025). The Executive Order states that PSLF has "misdirected tax dollars into activist organizations that not only fail to serve the public interest, but actually harm our national security and American values." *Id.* at 11885. It directs the Secretary of Education to propose revisions to PSLF's implementing regulations to ensure that the "definition of 'public service' excludes organizations" that engage in certain activities. *Id.*

23. Specifically, the Executive Order directs the Secretary of Education to "propose revisions to 34 C.F.R. 685.219, [the] Public Service Loan Forgiveness Program, … that ensure the definition of 'public service' excludes organizations that engage activities that have a substantial illegal purpose," including (a) "aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws"; (b) "supporting terrorism including … by engaging in violence for the purpose of obstructing or influencing Federal Government policy"; (c) "child abuse, including the chemical and surgical castration or mutilation of children or the trafficking of children to so-called transgender sanctuary States for purposes of emancipation from their lawful parents, in violation of applicable law"; (d) "engaging in a pattern of aiding and abetting illegal

---

[4] William D. Cather, Erica E. Harris, & Miles A. Romney, *Your tax dollars at work: The effectiveness of the public service loan forgiveness program*, 47 J. of the Am. Taxation Ass'n 7–22 (2025) (noting that nonprofits with paid employees expanded their workforce after the passage of PSLF and thus increased program capacity and mission spending).

[5] Study: Benefits of Public Service Loan Forgiveness Program Outweigh Costs, https://www.einnews.com/pr_news/745177582/study-benefits-of-public-service-loan-forgiveness-program-outweigh-costs.

discrimination"; or (e) "engaging in a pattern of violating State tort laws, including laws against trespassing, disorderly conduct, public nuisance, vandalism, and obstruction of highways." 90 Fed. Reg. at 11885.

24. The Executive Order does not provide standards for determining what constitutes a "substantial illegal purpose" or explain why certain activities and organizations are targeted while others are not.

25. On August 15, 2025, the Department published a notice of proposed rulemaking (NPRM) containing proposed language for the Rule. William D. Ford Federal Direct Loan (Direct Loan) Program, 90 Fed. Reg. 40155 (Aug. 18, 2025). After a 30-day period for public comment, on October 31, 2025, the Department published the Rule, with an effective date of July 1, 2026.

**The Department's New PSLF Rule**

26. The Department's new PSLF rule imposes additional requirements for PSLF eligibility that do not appear in the statute and that contradict Congress's unambiguous directive that employment at all employers specified in the PSLF statute, including all 501(c)(3) organizations, qualifies for PSLF. The regulation implementing PSLF specifies that a borrower seeking loan forgiveness must work full-time for a "qualifying employer." 34 C.F.R. § 685.219(c)(1)(ii). The prior definition of "qualifying employer" tracked the PSLF statute's enumeration of "public service jobs," including, without qualification, all 501(c)(3) organizations. *See* 34 C.F.R. § 685.219(b). The Rule changes the definition of "qualifying employer" to exclude "organizations that engage in activities such that they have a substantial illegal purpose." 90 Fed. Reg. at 49001 (34 C.F.R. § 685.219(b)(27)(ii)). No such exclusion exists in the PSLF statute.

27. The Rule defines "substantial illegal purpose" to mean:

    (i)    aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;

10

(ii) Supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;

(iii) Engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law;

(iv) Engaging in the trafficking of children to another State for purposes of emancipation from their lawful parents in violation of Federal or State law;

(v) Engaging in a pattern of aiding and abetting illegal discrimination; or

(vi) Engaging in a pattern of violating State laws [on trespassing, disorderly conduct, public nuisance, vandalism, or obstruction of highways].

*Id.* (34 C.F.R. § 685.219(b)(30)).

28. The Rule defines "[a]iding or abetting" to have "the same meaning as defined under 18 U.S.C. 2." *Id*. at 49000 (34 C.F.R. § 685.219(b)(1)).

29. The Rule defines "illegal discrimination" to mean "a violation of any Federal discrimination law including, but not limited to, the Civil Rights Act of 1964 (42 U.S.C. 1981 *et seq.*), Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*), and the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 *et seq.*)." *Id*. (34 C.F.R. § 685.219(b)(12)).

30. The Rule provides the Secretary with exclusive authority to determine whether an employer has a substantial illegal purpose. To disqualify an employer, the Secretary must determine "by a preponderance of the evidence" that the employer "has engaged on or after July 1, 2026, in illegal activities such that it has a substantial illegal purpose … considering the materiality of any illegal activities or actions as described in [the Rule]." *Id.* at 49002 (34 C.F.R. § 685.219(h)(1)). The Rule does not define the term "materiality."

31. In making a disqualification determination, the Secretary need not rely on any judicial or other administrative adjudication of a violation of the law. A final court judgment, a

guilty or *nolo contendere* plea, or a settlement admitting a violation, in a case under the relevant laws, however, will be considered conclusive evidence that the employer has engaged in illegal activities. *Id*. at 49002 (34 C.F.R. § 685.219(h)(1)).

32. The Rule contains no limitations on the other types of evidence or sources of allegations that can give rise to the Secretary's determination that an employer has engaged in illegal activities such that it has a substantial illegal purpose. Similarly, there are no standards in the Rule for determining what constitutes "engaging in a pattern of aiding and abetting illegal discrimination" or "aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws." The Rule defines "aiding and abetting" to have the same meaning as in 18 U.S.C. § 2, but it offers no explanation or guidance as to how that criminal-law concept will apply to civil violations of immigration and anti-discrimination statutes.

33. The Rule also creates a new certification obligation for qualifying employers. Each time a PSLF-participating borrower updates the Department regarding the borrower's employment status, the borrower does so by submitting an employment certification form (ECF). The Department recommends that each borrower submit an ECF once a year, but there is no limit or requirement for how often a borrower submits an ECF form during the repayment process. As part of the ECF process, employers are required to certify that objective factual information—the EIN and the borrower's dates of employment—contained on a borrower's ECF is correct. The Rule adds a requirement for employers to certify that they have not engaged in any activities with a "substantial illegal purpose," as defined by the Rule. 90 Fed. Reg. at 49002 (34 C.F.R. § 685.219(i)(1)(i)).

34. If the employer fails to certify that it has not engaged in activities with a substantial illegal purpose, the Secretary "will determine" that the employer "has a substantial illegal purpose." *Id.* (34 C.F.R. § 685.219(i)).

35. If the Secretary determines that an employer has "a substantial illegal purpose"—either through independent determination or because the employer did not meet the rule's certification requirement—the employer is either (a) excluded as a "qualifying employer" for ten years and cannot regain qualifying employer status until the employer satisfies the certification requirement, or (b) excluded as a qualifying employer until the Secretary approves a "corrective action plan" that meets unspecified "terms and conditions imposed by the Secretary," and the employer satisfies the certification requirement. *Id.* (34 C.F.R. § 685.219(j)).

36. Borrowers who are employed at organizations the Secretary determines have a substantial illegal purpose do not receive credit for any monthly payments after such determination is made. Borrowers employed at organizations the Secretary determines have a substantial illegal purpose cannot credit future monthly payments made for as long as the Secretary does not reinstate their employer as a "qualifying employer," even if employment with those employers qualifies as a "public service job" under the PSLF statute. *Id.* at 49001 (34 C.F.R. § 685.219(c)(4)).

37. The Rule's cost-benefit analysis calculates net savings of $179–$191 million annually. *Id.* at 48991. The Department estimates that the Rule "may impact less than 10 employers per year across the country," but does not provide any examples of any employers that would be impacted or any evidence to support the estimate about the number of employers or employees affected or the likely savings from the Rule. *Id.* at 48974.

**The Rule Harms Plaintiffs**

38. Plaintiffs RFK Human Rights, The Council, The Door, and LULAC are tax-exempt section 501(c)(3) organizations. Full-time employment with each organization is a "public service job" within the meaning of the PSLF statute. 20 U.S.C. § 1087e(m)(3)(B)(i).

39. All Plaintiffs currently employ individuals who are using their employment with Plaintiffs to qualify for PSLF or rely on the availability of PSLF in recruiting staff. The individuals using employment with Plaintiffs to qualify for PSLF intend to apply for PSLF forgiveness and receive credit for the loan payments made while working for Plaintiffs.

40. Because of the Rule's certification requirement, each Plaintiff will need to periodically certify that it does not engage in any activities with a substantial illegal purpose.

41. Although none of Plaintiffs' activities violate any federal or state laws, Plaintiffs can have no certainty about whether the Secretary will determine their activities have a substantial illegal purpose within the meaning of the Rule, or will investigate their work and require them to prove the lawfulness of their work.

42. Plaintiffs are unsure which of their activities could be determined by the Department to constitute aiding or abetting violations of Federal immigration laws, because the Rule provides no guidance as to how the Department will apply that criminal-law concept to civil violations of immigration laws. For example, The Door provides direct legal, health, and social services to undocumented young people between the ages of 12 and 24. The Rule is unclear whether offering such assistance to (or advocating and conducting policy work on behalf of) an individual whom the Department deems to have violated federal immigration laws would itself constitute aiding or abetting the violation of federal immigration laws, making them an ineligible employer under the Rule. Likewise, RFK Human Rights litigates habeas petitions for people who

are unlawfully detained by the Department of Homeland Security in immigration detention centers and claims under the Federal Tort Claims Act for people abused by officials in those detention centers. To certify compliance with the Rule, Plaintiffs will need to speculate about the scope of the Rule and to consult with counsel to determine whether any of their activities potentially could be considered to constitute aiding and abetting violations of the immigration laws.

43. Plaintiffs are likewise uncertain which of their activities the Secretary might determine to constitute engaging in a pattern of aiding and abetting violations of federal anti-discrimination laws. For example, RFK Human Rights convenes institutional investors for conferences to discuss, among other topics, the financial and business benefits of diversity, equity, and inclusion (DEI) initiatives. The Rule provides no standards by which such activities might be judged, and there is no published case law applying the standards for criminal accessory liability to federal anti-discrimination statutes.

44. Each Plaintiff will need to expend time and money to consult with counsel and review all its activities to determine whether it can certify that is does not engage in any activities that have "a substantial illegal purpose" as defined by the Rule, and whether it must end or modify any activities to permit certification. *See* 90 Fed. Reg. at 48993 (recognizing that employers will face compliance costs relating to "the costs of legal counsel, restructuring efforts, and changes to the organization's documentation processes"). Even after conducting the necessary due diligence to certify compliance, no Plaintiff can be sure that the Secretary will not disagree with its assessment of the Rule's requirements and haul it into an administrative proceeding.

45. Each Plaintiff relies on PSLF to recruit and retain employees, and the availability of PSLF acts as a subsidy to each Plaintiff. *See id*. at 48969 (recognizing that PSLF eligibility "indirectly subsidize[s] employment at [qualifying] employers"). The risk of losing eligibility for

PSLF will make it more difficult for Plaintiffs to recruit and retain workers, thereby diminishing the value of the subsidy that Congress intended to provide to 501(c)(3) organizations, yet no Plaintiff can eliminate that risk even by engaging in extensive due diligence efforts because the Rule's substantive legal requirements are not adequately specified.

46. The Secretary acknowledges that public service employers like Plaintiffs will be impacted by the Rule, stating that "organizations in some fields are more likely to be affected by others, either by … the deterrent effect on their activities, difficulty recruiting employees, or by their employees not being granted PSLF forgiveness and seeking alternate employment." *Id.* at 48995.

## COUNT I
### (APA – Contrary to Law – Higher Education Act)

47. The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

48. The Rule violates the HEA because the HEA provides that all 501(c)(3) organizations, without qualification, are eligible for PSLF.

49. The Rule's additional qualifications for PSLF eligibility are contrary to the HEA.

## COUNT II
### (APA – Action in Excess of Statutory Authority – Higher Education Act)

50. The APA directs courts to hold unlawful and set aside agency actions that are "in excess of statutory jurisdiction, authority, or limitations or short of statutory right." 5 U.S.C. § 706(2)(C).

51. The HEA does not grant the Secretary the authority to reduce or restrict eligibility for a public service job, enact additional substantive requirements as to what constitutes a public

service job, target individual organizations or categories of organizations that the HEA defines as public service jobs, or establish an administrative regime to adjudicate whether qualifying employers have a substantial illegal purpose. *See* 20 U.S.C. § 1087e(m).

52. By purporting to empower the Secretary to exclude employers that satisfy all the statutorily enumerated conditions from PSLF eligibility, the Rule exceeds the Secretary's statutory authority.

## COUNT III
### (APA – Arbitrary and Capricious)

53. The APA directs courts to hold unlawful and set aside agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

54. The Rule is arbitrary and capricious because it lacks a rational basis, does not adequately consider costs and benefits, fails to account for reliance interests, fails to provide a reasoned basis for the activities it targets, and fails to identify any section 501(c)(3) organizations, or other PSLF-eligible employers, that have engaged in any activity with a "substantial illegal purpose."

## COUNT IV
### (Due Process)

55. The Rule violates the Due Process Clause because it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

56. The Rule is unconstitutionally vague because it does not give Plaintiffs fair notice of what activities by qualifying employers are prohibited and whether an employer may be excluded by the Secretary.

57. Given the lack of articulated standards and evidentiary requirements, employers are unable to effectively assess whether the Secretary is likely to conclude that an employer is no longer eligible for the PSLF subsidy.

58. Likewise, given the Secretary's wide latitude in making the determination of substantial illegal purpose, employers are unable to certify, with any degree of certainty, that they have not engaged in any activity with a substantial illegal purpose within the meaning of the Rule, as subsequently determined by the Secretary. Because the Secretary's determination does not require any court involvement, or even the existence of a civil, administrative, or criminal proceeding, circumstances or factors unknown to the employer could give rise to the Secretary's determination that the employer engaged in activity with a substantial illegal purpose.

59. The Rule's lack of standards invites discriminatory enforcement. There are no restrictions on what the Secretary can rely on in making her determination, and the Secretary's determination need not be tethered to any precedential understanding of the law.

60. The Rule's application of criminal-law accessory liability standards to civil immigration and discrimination contexts is impermissibly vague, because the Rule provides no guidance on how accessory liability will apply, and there is no case law applying accessory liability to those contexts. *See, e.g.*, *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994) ("Congress has not enacted a general civil aiding and abetting statute.").

## COUNT V
### (First Amendment)

61. The First Amendment to the United States Constitution provides the government "shall make no law . . . abridging the freedom of speech." U.S. Const. Amend. I.

62. The Rule chills protected speech because it is so standardless that it fails to properly identify or define specific speech or expressive conduct that is prohibited.

63. For example, Plaintiffs each participate in advocacy work on behalf of immigrants, many of whom are undocumented but in the process of seeking legal status. The Rule provides no clarification regarding what aspects of their advocacy work—which includes both speech and expressive conduct—is swept up in the proscription against the "substantial illegal purpose" of aiding and abetting in the violation of federal immigration laws.

64. Similarly, RFK Human Rights engages in advocacy for DEI. The Trump Administration has taken the position that much if not all private-sector DEI activity is illegal under Federal civil-rights law. *See* Executive Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025). The Rule provides no clarification regarding what aspects of Plaintiff's DEI-related activities—which include both speech and expressive conduct—are covered by the proscription against aiding and abetting violations of federal antidiscrimination laws.

65. The Rule deters Plaintiffs' constitutionally protected speech and chills Plaintiffs' willingness to engage in constitutionally protected speech out of a credible concern that the Secretary will exclude Plaintiffs from participation in the PSLF program based on speech or expressive conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

    a. Declare the Rule unlawful;

    b. Set aside the Rule;

    c. Declare unlawful any action by Defendants to exclude from PSLF eligibility any borrower who works for an employer that meets the statutory criteria for "public service job" as enumerated in 20 U.S.C. § 1087e(m);

  d. Declare that the Secretary lacks the authority to change the statutory criteria for PSLF;

  e. Award Plaintiffs their costs and attorneys' fees for this action; and

  f. Grant any other relief as this Court deems appropriate.

Dated: November 4, 2025      Respectfully submitted,

             /s/ Cormac A. Early
             Cormac A. Early (DC Bar No. 1033835)
             Adina H. Rosenbaum (DC Bar No. 490928)
             Adam Pulver (DC Bar No. 1020475)
             Public Citizen Litigation Group
             1600 20th Street NW
             Washington, DC 20009
             (202) 588-1000

             Aaron S. Ament (DC Bar No. 1602164)
             Chris Bryant (DC Bar No. 1673495)
             Eric Rothschild (DC Bar No. 1048877)
             Daniel A. Zibel (DC Bar No. 491377)
             National Student Legal Defense Network
             1701 Rhode Island Ave. NW
             Washington, D.C. 20036
             (202) 734-7495

             *Attorneys for Plaintiffs*