# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ROBERT F. KENNEDY CENTER FOR JUSTICE AND HUMAN RIGHTS, *et al.*, *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION, *et al.*, <br><br> *Defendants*. | Case No. 25-3860-AHA |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Aaron S. Ament (DC Bar No. 1602164)
Chris Bryant (DC Bar No. 1673495)
Eric Rothschild (DC Bar No. 1048877)
Daniel A. Zibel (DC Bar No. 491377)
National Student Legal Defense Network
1701 Rhode Island Ave. NW
Washington, DC 20036
(202) 734-7495

Cormac A. Early (DC Bar No. 1033835)
Adina H. Rosenbaum (DC Bar No. 490928)
Adam R. Pulver (DC Bar No. 486293)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Attorneys for Plaintiffs*

February 9, 2026

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Introduction ........................................................................................................... 1

Background ...........................................................**Error! Bookmark not defined.**

    A.    Statutory Background .......................................**Error! Bookmark not defined.**

    B.    The New PSLF Rule ................................................................ 5

    C.    This Lawsuit .......................................................................... 9

Legal Standard ..................................................................................................... 12

Argument ............................................................................................................. 13

    I.    Plaintiffs have standing to challenge the PSLF Rule. ............................... 13

        A.    Plaintiff has standing.........................................**Error! Bookmark not defined.**

        B.    The Tucker Act does not divest this Court of jurisdiction.**Error! Bookmark not defined.**

        C.    Plaintiffs are likely to succeed on their APA claims. ....... **Error! Bookmark not defined.**

            1.    USDA's termination of funding for the clearinghouse services constitutes final agency action..................................................**Error! Bookmark not defined.**

            2.    USDA's termination of funding for the clearinghouse services is contrary to law. ..............................................................**Error! Bookmark not defined.**

            3.    USDA's termination of funding for the clearinghouse services is arbitrary and capricious..........................................................**Error! Bookmark not defined.**

    II.    The PSLF Rule is contrary to law and exceeds the Department's statutory authority. . 17

    III.    The PSLF Rule is arbitrary and capricious. .................................................. 22

        A.    The Rule has no rational connection to the factual record............................... 22

        B.    The Rule is illogical on its own terms. ............................................. 25

    IV.    The PSLF Rule is impermissibly vague in violation of the Due Process Clause. ......... 29

    V.    The PSLF Rule suppresses protected speech in violation of the First Amendment. ..... 34

Conclusion ........................................................................................................... 36

# TABLE OF AUTHORITIES

**Page**

## Cases

*Air Excursions LLC v. Yellen*,
66 F.4th 272 (D.C. Cir. 2023) ................................................................................ 13

*Al-Eryani v. Immigrant Investor Programs Office*,
754 F. Supp. 3d 101 (D.D.C. 2024) ................................................................. 12, 13

*American Bar Ass'n v. United States Department of Education*,
370 F. Supp. 3d 1 (D.D.C. 2019) ......................................................... 3, 29, 30

*American Federation of Government Employees. v. FLRA*,
470 F.3d 375 (D.C. Cir. 2006) ............................................................................. 22

*Anglers Conservation Network v. Pritzker*,
809 F.3d 664 (D.C. Cir. 2016) ............................................................................. 17

*Arizona v. United States*,
567 U.S. 387 (2012) .............................................................................................. 25

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ................................................................................................ 34

*Board of Regents of State Colleges v. Roth*,
408 U.S. 564 (1972) ........................................................................................ 29, 30

*Bob Jones University v. United States*,
461 U.S. 574 (1983) ........................................................................................ 20, 21

*Central Bank of Denver, N.A., v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) .............................................................................. 25, 26, 27

*Church of Scientology v. Commissioner of Internal Revenue*,
83 T.C. 381 (1984) ................................................................................................ 32

*Clapper v. Amnesty International USA*,
568 U.S. 398 ......................................................................................................... 15

*Corbett v. TSA*,
19 F.4th 478 (D.C. Cir. 2021) .............................................................................. 13

*Edgar v. Haines*,
2 F.4th 298 (4th Cir. 2021) .................................................................................. 34

*FCC v. Fox Television Stations*,
  567 U.S. 239 (2012) ........................................................................................ 29

*Goldberg v. Kelly*,
  397 U.S. 254 (1970) ........................................................................................ 30

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ........................................................................................ 29

*Gross v. United States*,
  771 F.3d 10 (D.C. Cir. 2014) ........................................................................... 20

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ......................................................................... 26

*Kingdom v. Trump*,
  No. 25-cv-691-RCL, 2025 WL 1568238 (D.D.C. June 3, 2025) ........................... 28

*Kingdomware Technologies, Inc. v. U.S.*,
  579 U.S. 162 (2016) ........................................................................................ 17

*Lexmark International, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ........................................................................................ 13

*Louisiana v. Biden*,
  622 F. Supp. 3d 267 (E.D. La. 2022) ................................................................ 28

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ........................................................................................ 13

*Media Matters for America v. Paxton*,
  732 F. Supp. 3d 1 (D.D.C. 2024) ...................................................................... 34

*Mingo Logan Coal Co. v. EPA*,
  829 F.3d 710 (D.C. Cir. 2016) ......................................................................... 22

*Monsanto v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ........................................................................................ 16

*Motor Vehicle Manufacturers Ass'n of the U.S., Inc. v. State Farm Mutual Automobile Insurance
  Co.*,
  463 U.S. 29 (1983) .......................................................................................... 22

*National Ass'n of Diversity Officers in Higher Education v. Trump*,
  767 F. Supp. 3d 243 (D. Md. 2025) .............................................................. 31, 33

iii

*National Telephone Co-op Ass'n v. FCC*,
  563 F.3d 536 (D.C. Cir. 2009) .................................................................. 22

*Planned Parenthood of Greater N.Y. v. HHS*,
  No. CV 25-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025) ..................... 13

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) .................................................................................. 34

*Reed v. Town of Gilbert, Arizona*,
  576 U.S. 155 (2015) .................................................................................. 34

*Rosenberger v. Rector and Visitors of University of Virginia*,
  515 U.S. 819 (1995) .................................................................................. 34

*Sessions v. Dimaya*,
  584 U.S. 148 (2018) .................................................................................. 31

*Sierra Club v. Mainella*,
  459 F. Supp. 2d 76 (D.D.C. 2006) ........................................................... 13

*State National Bank of Big Spring v. Lew*,
  795 F.3d 48 (D.C. Cir. 2015) .................................................................... 13

*Tyler v. Hennepin County, Minnesota*,
  598 U.S. 631 (2023) .................................................................................. 15

*U.S. v. Brown*,
  7 F.3d 1155 (5th Cir. 1993) ...................................................................... 28

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982) ............................................................................. 29, 33

*Western Minnesota Municipal Power Agency v. FERC*,
  806 F.3d 588 (D.C. Cir. 2015) ............................................................ 17, 18

**Statutes**

5 U.S.C. §§ 702, 704 ..................................................................................... 12

5 U.S.C. § 706(2)(A) ...................................................................................... 12

5 U.S.C. § 706(2)(B) ...................................................................................... 12

5 U.S.C. § 706(2)(C) ................................................................................................ 12

8 U.S.C. § 1189 ........................................................................................................ 6

8 U.S.C. § 1325 ..................................................................................................... 5, 6

16 U.S.C. § 800(a) ................................................................................................. 18

18 U.S.C. § 2 ..................................................................................................... 6, 25

20 U.S.C. § 1087e(b)(9)(C) .................................................................................. 17

20 U.S.C. § 1087e(m)(1) ................................................................................... 3, 17

20 U.S.C. § 1087e(m)(3)(B)(i) ......................................................................... 17, 21

26 U.S.C. § 501(a) .................................................................................................. 4

26 U.S.C. § 501(c)(3) ................................................................................ 4, 17, 20, 21

29 U.S.C. § 621 ....................................................................................................... 7

42 U.S.C. § 1981 ..................................................................................................... 7

42 U.S.C. § 12101 ................................................................................................... 7

Pub. L. No. 110-84, § 401, 121 Stat. 784, 800–01 (2007) .................................... 2

## Rules

Fed. R. Civ. P. 56(a) ............................................................................................. 13

## Regulations

34 C.F.R. § 685.219 ............................................................................................. 4, 5

34 C.F.R. § 685.219(a) ........................................................................................... 2

34 C.F.R. § 685.219(b)(1) ..................................................................................... 25

34 C.F.R. § 685.219(b)(12) ..................................................................................... 7

34 C.F.R. § 685.219(b)(27)(ii) ................................................................................ 6

34 C.F.R. § 685.219(b)(30) ................................................................................. 6, 25

34 C.F.R. § 685.219(b)(34) ............................................................................ 7, 32

34 C.F.R. § 685.219(c)(4) ................................................................................... 8

34 C.F.R. § 685.219(e) .................................................................................... 4, 8

34 C.F.R. § 685.219(g)(7) ................................................................................. 14

34 C.F.R. § 685.219(h) ..................................................................................... 31

34 C.F.R. § 685.219(h)(1) ................................................................................... 7

34 C.F.R. § 685.219(h)(2) ................................................................................. 35

34 C.F.R. § 685.219(i) ........................................................................................ 8

34 C.F.R. § 685.219(i)(1)(i) ................................................................................ 8

34 C.F.R. § 685.219(i)(1)(i), (h) ....................................................................... 14

34 C.F.R. § 685.219(i)(1)(ii) ............................................................................. 14

34 C.F.R. § 685.219(j) .................................................................................... 8, 14

Restoring Public Service Loan Forgiveness.,
    Executive Order 14235, 90 Fed Reg 11885 (Mar.7, 2025) ................................. 5, 6

William D. Ford Federal Direct Loan (Direct Loan) Program (PSLF Rule),
    90 Fed. Reg. 40155 (Aug. 18, 2025) .. 6, 8, 13, 16, 18, 19, 20, 21, 22, 23, 24, 26, 28, 30, 32, 33,
    35

## Other Authorities

153 Cong. Rec. H7556 (July 11, 2007) ............................................................. 18

153 Cong. Rec. S11,245 (Sept. 7, 2007) ............................................................. 3

William D. Cather, Erica E. Harris, & Miles A. Romney, *Your tax dollars at work: The
    effectiveness of the public service loan forgiveness program*, 47 J. of the Am. Taxation Ass'n
    7–22 (2025) ...................................................................................................... 5

Brian Fitzpatrick (R-PA) and 12 other Republican lawmakers, Letter to the Chairwoman of the
    House Committee on Education and the Workforce (Apr. 18, 2018),
    https://www.insidehighered.com/sites/default/files/media/PSLF%20Letter%20to%20House%2
    0Leadership.PDF ............................................................................................. 4

IRS Data Book Table 14, Tax-exempt organizations and nonexempt charitable trusts, https://www.irs.gov/statistics/soi-tax-stats-tax-exempt-organizations-and-nonexempt-charitable-trusts-irs-data-book-table-14 ................................................................................. 24

Revenue Ruling 75-384, 1975-2 C.B. 20, https://www.irs.gov/pub/irs-tege/rr75-384.pdf .......... 20

Study: Benefits of Public Service Loan Forgiveness Program Outweigh Costs, https://www.einnews.com/pr_news/745177582/study-benefits-of-public-service-loan-forgiveness-program-outweigh-costs .......................................................................................... 5

U.S. Equal Employment Opportunity Commission, What You Should Know About DEI-Related Discrimination at Work, https://www.eeoc.gov/wysk/what-you-should-know-about-dei-related-discrimination-work ......................................................................................... 25

## INTRODUCTION

The Public Service Loan Forgiveness Program (PSLF) cancels federal student loan debt for borrowers who make 120 qualifying payments while working full-time in a public service job. By statute, whether a job is a qualifying public service job is based solely on the characteristics of the employer; among the categories of qualifying employers are *any* tax-exempt 501(c)(3) organization.

In a new rule set to take effect on July 1, 2026, however, the Department of Education has converted the program into one that penalizes organizations (and those who work for them) based on the Department's disapproval of their policy positions and lawful organizational activities. Despite the statute's clarity, working for a 501(c)(3) organization (or an employer in another enumerated category) will no longer guarantee that a borrower receives credit toward PSLF for payments made while working for that employer. Instead, a job will be a qualifying "public service job" only if the employer can satisfy the Department that it does not have a "substantial illegal purpose," based on whether it has engaged in what the agency has characterized as "illegal activities." But the Rule does not tie an employer's ineligibility to participate in PSLF to *all* violations of the law, or to violations of laws that the Department itself administers. Instead, the Department has curated a list of six kinds of "illegal activity" that can trigger disqualification, and it has defined those "illegal activities" in such broad terms that the Rule could allow for an employer's disqualification based solely on lawful activities that this administration disfavors, such as efforts to protect immigrants' rights; promote diversity, equity, and inclusion; encourage international civic participation; or provide gender-affirming care to minors. Beyond the Department's cherry-picked list of "illegal activities," no other activity, no matter how unlawful, triggers scrutiny by the Department, or exclusion from the PSLF program.

Plaintiffs are four 501(c)(3) nonprofit organizations that participate in PSLF and whose activities—including work on behalf of immigrants and work to promote diversity—risk being unjustly deemed "illegal" under the Rule's vague new standards.

The Rule contradicts the text of the PSLF statute, which provides without qualification that all 501(c)(3) organizations are eligible employers. The Rule is also arbitrary and capricious, because its reasoning is illogical even on its own terms, and because there is no evidence that the problem the Rule purports to address has ever arisen. Moreover, because the Rule is irremediably vague, offering no intelligible guidance for PSLF-participating employers like Plaintiffs to govern their conduct or for the Department to avoid arbitrary ad-hoc enforcement, it violates the Fifth Amendment's Due Process Clause. And because the Rule operates to chill speech expressing viewpoints disfavored by the current administration, it violates the First Amendment. This Court should declare the Rule unlawful and vacate it.

## BACKGROUND

### A. Statutory Background

In 2007, Congress, recognizing that the skyrocketing cost of higher education made it nearly impossible for public servants to obtain the degrees required to serve in their professions and pay back their resulting student loans, enacted the College Cost Reduction and Access Act on a bipartisan basis. Pub. L. No. 110-84, § 401, 121 Stat. 784, 800–01 (2007). The College Cost Redaction and Access Act amended the Higher Education Act (HEA) and created PSLF. PSLF "is intended to encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their Direct loans," *i.e.*, student loans issued by the Department under Title IV of the HEA, "after they satisfy the [program's] public service and loan payment requirements." 34 C.F.R. § 685.219(a). It assists students who want "to pursue a career

in public service [to] be able to take those jobs ... often[] at lower pay" by "reliev[ing] them[] of the huge burden of debt they face."[1]

PSLF benefits not only borrowers but also their nonprofit employers. "[T]he PSLF statute facilitates a public service organization's recruitment of employees by decreasing their employees' long-term debt burden. This debt relief reduces pressure on public service organizations to raise salaries." *Am. Bar Ass'n v. United States Dep't of Educ.*, 370 F. Supp. 3d 1, 19 (D.D.C. 2019).

To provide these benefits to borrowers and their employers, Congress mandated that the Secretary "shall cancel the balance of interest and principal due ... on any eligible Federal Direct Loan not in default for a borrower who[:]

> (A)    has made 120 monthly payments on the eligible Federal Direct Loan after October 1, 2007, pursuant to [one of several enumerated loan repayment plans] ... ; and
>
> (B)
>
> > (i)    is employed in a public service job at the time of such forgiveness; and
> >
> > (ii)    has been employed in a public service job during the period in which the borrower makes each of the 120 payments described in subparagraph (A)."

20 U.S.C. § 1087e(m)(1).

The PSLF statute defines the term "public service job" to mean full-time employment in any of several enumerated categories including emergency management, government (excluding time served as a member of Congress), military service, public safety, law enforcement, public health, public education, certain types of social services, public interest law services, early childhood education, and library sciences, *id.* § 1087e(m)(3)(B). Of particular relevance to this

---

[1] 153 Cong. Rec. S11,245 (daily ed. Sept. 7, 2007) (statement of Sen. Sherrod Brown).

litigation, it also specifies that jobs with organizations "described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title"—that is, 501(c)(3) organizations—are "public service jobs" that qualify for PSLF. The statute treats all 501(c)(3) organizations uniformly, no matter what issues they work on or services they provide, or any other characteristic.

By regulation, the Department has established an application process for PSLF loan forgiveness. *See* 34 C.F.R. § 685.219. After making 120 qualifying payments on eligible loans, the borrower may request loan forgiveness by filing an application form provided by the Department. *Id.* § 685.219(e). Currently, until the July 1, 2026, effective date of the Rule challenged in this case, that form includes an "Employer Certification" section that requires the employer to certify its Employer Identification Number (EIN), name, and address, the borrower's dates of employment, whether the borrower worked full-time or part-time, and the average hours worked per week.[2] No other information about the employer is required, unless the Department cannot discern whether the employment was in a statutory "public service job" during the period that the borrower made payments.

PSLF has had a substantial impact on nonprofit employers. Members of Congress report that, according to their constituents, "PSLF has transformed [nonprofit] workplaces. It helps recruit and retain top talent, making workforces more efficient" and "provides the financial feasibility [borrowers] need to dedicate their careers to serving our communities in a public service capacity."[3] According to one study, more than 96 percent of nonprofits with paid

---

[2] *See* Dep't of Educ., *Public Service Loan Forgiveness (PSLF) & Temporary Expanded PSLF (TEPSLF) Certification & Application*, OMB No. 1845-0110, *available at* https://studentaid.gov/sites/default/files/public-service-application-for-forgiveness.pdf.

[3] *See* Letter from Brian Fitzpatrick (R-PA) and 12 other Republican lawmakers to the Chairwoman of the House Committee on Education and the Workforce (Apr. 18, 2018), available at

employees have been able to expand their workforce because of PSLF.[4] As an author of that study explained, "the passage of the PSLF [program] was associated with nonprofits being better able to fulfill their missions in the communities they serve."[5]

### B. The New PSLF Rule

On March 7, 2025, President Trump issued an Executive Order titled "Restoring Public Service Loan Forgiveness." Executive Order 14235, 90 Fed Reg. 11885 (Mar. 7, 2025). The Executive Order states that PSLF has "misdirected tax dollars into activist organizations that not only fail to serve the public interest, but actually harm our national security and American values." *Id.* at 11885. It directs the Secretary of Education to propose revisions to PSLF's implementing regulations to ensure that the "definition of 'public service' excludes organizations" that engage in certain activities. *Id.*

Specifically, the Executive Order directs the Secretary of Education to "propose revisions to 34 C.F.R. 685.219, [the] Public Service Loan Forgiveness Program, … that ensure the definition of 'public service' excludes organizations that engage in activities that have a substantial illegal purpose," including (a) "aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws"; (b) "supporting terrorism including … by engaging in violence for the purpose of obstructing or influencing Federal Government policy"; (c) "child abuse, including the chemical and surgical castration or mutilation of children or the trafficking of children to

---

https://www.insidehighered.com/sites/default/files/media/PSLF%20Letter%20to%20House%20Leadership.PDF.

[4] William D. Cather, Erica E. Harris, & Miles A. Romney, *Your tax dollars at work: The effectiveness of the public service loan forgiveness program*, 47 J. of the Am. Taxation Ass'n 7–22 (2025) (noting that nonprofits with paid employees expanded their workforce after the passage of PSLF and thus increased program capacity and mission spending).

[5] American Accounting Association, *Study: Benefits of Public Service Loan Forgiveness Program Outweigh Costs* (Sept. 23, 2024), https://www.einnews.com/pr_news/745177582/study-benefits-of-public-service-loan-forgiveness-program-outweigh-costs.

so-called transgender sanctuary States for purposes of emancipation from their lawful parents, in violation of applicable law"; (d) "engaging in a pattern of aiding and abetting illegal discrimination"; or (e) "engaging in a pattern of violating State tort laws, including laws against trespassing, disorderly conduct, public nuisance, vandalism, and obstruction of highways." 90 Fed. Reg. at 11885.

On August 15, 2025, the Department published a notice of proposed rulemaking (NPRM) containing proposed language for the Rule. William D. Ford Federal Direct Loan (Direct Loan) Program, 90 Fed. Reg. 40155 (Aug. 18, 2025). After a 30-day period for public comment, on October 31, 2025, the Department published the Rule, with an effective date of July 1, 2026.

The Rule amends the regulatory definition of a "qualifying employer" to exclude "organizations that engage in activities such that they have a substantial illegal purpose." PSLF Rule, 90 Fed. Reg. at 49001 (34 C.F.R. § 685.219(b)(27)(ii)). The Rule defines "substantial illegal purpose" to mean:

(i)     aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;

(ii)    Supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;

(iii)   Engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law;

(iv)    Engaging in the trafficking of children to another State for purposes of emancipation from their lawful parents in violation of Federal or State law;

(v)     Engaging in a pattern of aiding and abetting illegal discrimination; or

(vi)    Engaging in a pattern of violating State laws [on trespassing, disorderly conduct, public nuisance, vandalism, or obstruction of highways].

*Id.* (34 C.F.R. § 685.219(b)(30), (34)).

The Rule defines "[a]iding or abetting" to have "the same meaning as defined under 18 U.S.C. 2," and defines "illegal discrimination" to mean "a violation of any Federal discrimination law including, but not limited to, the Civil Rights Act of 1964 (42 U.S.C. 1981 *et seq.*), Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*), and the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 *et seq.*)." *Id*. (34 C.F.R. § 685.219(b)(12)).

The Rule provides the Secretary with exclusive authority to determine whether an employer has a "substantial illegal purpose." The Secretary may disqualify an employer by determining "by a preponderance of the evidence" that the employer "has engaged on or after July 1, 2026, in illegal activities such that it has a substantial illegal purpose … considering the materiality of any illegal activities or actions as described in [the Rule]." *Id.* at 49002 (34 C.F.R. § 685.219(h)(1)). The Rule does not define the term "materiality."

In making a disqualification determination, the Secretary need not rely on any judicial or other administrative adjudication of a violation of the law. A final court judgment, a guilty or *nolo contendere* plea, or a settlement admitting a violation, in a case under the relevant laws will be considered conclusive evidence that the employer has engaged in illegal activities. *Id*. at 49002 (34 C.F.R. § 685.219(h)(1)). However, the Rule does not impose any limits on additional types of evidence or sources of allegations that can give rise to the Secretary's determination that an employer has engaged in illegal activities such that it has a substantial illegal purpose, with the exception of a finding that an organization has engaged in a pattern of violating state law, which requires a final, non-default state court judgment against the organization. *Id.* at 49001 (34 C.F.R. § 685.219(b)(34)).

The Rule also alters the certification obligation for qualifying employers. Under existing regulations, each time a PSLF-participating borrower updates the Department regarding the

borrower's employment status, the borrower does so by submitting an employment certification form (ECF). *See* 34 C.F.R. § 685.219(e).[6] The Department recommends that each borrower submit an ECF once a year, but there is no limit or requirement for how often a borrower submits an ECF form during the repayment process.[7] As part of the ECF process, employers are required to certify that objectively verifiable factual information—the EIN and the borrower's dates of employment—contained on a borrower's ECF is correct. *Id.* The Rule, however, adds a requirement for employers to certify that they have not engaged in any activities with a "substantial illegal purpose," as defined by the Rule. PSLF Rule, 90 Fed. Reg. at 49002 (34 C.F.R. § 685.219(i)(1)(i)). If the employer fails to certify that it has not engaged in activities with a substantial illegal purpose, the Secretary "will determine" that the employer "has a substantial illegal purpose." *Id.* (34 C.F.R. § 685.219(i)). An employer determined by the Secretary to have a substantial illegal purpose is excluded as a "qualifying employer" for PSLF, with the possibility of requalifying after ten years or subject to a "corrective action plan" with terms and conditions set by the Secretary. *Id.* (34 C.F.R. § 685.219(j)). When an organization is excluded as a qualifying employer under PSLF, employees do not receive credit for any monthly payments after such determination is made. *Id.* at 49001 (34 C.F.R. § 685.219(c)(4)).

The Department estimates that the Rule "may impact less than 10 employers per year across the country," but does not provide any examples of any employers that would be impacted or any evidence to support the estimate about the number of employers or employees affected or the likely savings from the Rule. *Id.* at 48974.

---

[6] *See* note 2, *supra*.

[7] *See* Fed. Student Aid, *Public Service Loan Forgiveness Form*, https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service/public-service-loan-forgiveness-application (last accessed February 9, 2026).

### C.  This Lawsuit

Plaintiffs are four 501(c)(3) organizations that have relied on the availability of PSLF in recruiting and retaining staff and that will imminently be required to certify to compliance with the PSLF Rule when current or former staff submit new ECFs after July 1, 2026.

Plaintiff Robert F. Kennedy Center for Justice and Human Rights d/b/a Robert & Ethel Kennedy Human Rights (KHRC) is a section 501(c)(3) tax-exempt organization. Perez Decl. ¶ 2. Founded in 1968 to accomplish Senator Robert F. Kennedy's vision for a more just and peaceful world, KHRC advocates for human rights issues in the courtroom, in the boardroom, and in the classroom. *Id.* It litigates immigration cases to achieve systemic change, investigates and exposes immigration-related abuses, and educates the public and policymakers on human rights abuses that occur in the immigration system. *Id.* ¶ 3. KHRC works alongside local, regional, and international partners to hold governments accountable by encouraging individual and collective actors (such as journalists and human rights defenders) to speak out, participate in public affairs, organize protests, and otherwise freely exercise and enjoy their human rights. *Id.* ¶ 4. In 2025, KHRC hosted the inaugural Young Women's Leadership Summit, which brought together 65 young women for a day of inspiration, education, and action. *Id.* ¶ 5. KHRC has also participated in litigation to support women's rights to healthcare and address sexual abuse of women in immigration detention, and the organization works with individuals and groups around the world to end violence and discriminatory practices against individuals based on their racial, ethnic, gender, or sexual identities and expression, often through litigation. *Id.* KHRC also runs the John Lewis Young Leaders Program, which supports a cohort of 15 college students each year with an impactful social justice or human rights capstone that they complete; eligibility for the fellowship is open to all undergraduate students, with priority given to students attending an Historically Black College or University (HBCU), Hispanic-Serving Institution (HIS), or Historically

Minority-Serving Institution (HMSI), as well as students from marginalized communities. *Id.* ¶ 6. KHRC employees are actively pursuing loan forgiveness under PSLF, and KHRC anticipates completing at least 6 ECFs in 2026. *Id.* ¶ 15. The availability of PSLF is a crucial part of KHRC's recruiting efforts, and the risk that KHRC may be deemed an ineligible employer in the future causes immediate harms to KHRC's ability to recruit and retain staff. *Id.* ¶¶ 17–20. At least two current KHRC employees would not have attended law school and pursued careers in immigration and human rights without the assurance that PSLF would be available. *Id.* ¶ 18.

Plaintiff The Door – A Center Of Alternatives, Inc. (The Door) is a section 501(c)(3) tax-exempt organization. Louie Decl. ¶ 2. The Door offers free and comprehensive programs and services including mental health counseling, health and nutrition assistance, legal services, housing support, arts, education, and career guidance to youth aged 12–24 in New York City. *Id.* ¶¶ 3, 4. The Door provides direct services, including legal representation and healthcare, to undocumented young people. *Id.* ¶ 6. The Door also provides services that target underserved, marginalized populations. *Id.* And The Door provides gender-affirming care, when medically appropriate, through its healthcare program. *Id.* The Door employs staff who are pursuing loan forgiveness under PSLF, and it relies on PSLF availability as part of its recruitment efforts. *Id.* ¶¶ 7–9.

Plaintiff American Immigration Council (The Council) is a section 501(c)(3) tax-exempt organization. Loweree Decl. ¶ 2. The Council works to advance positive public attitudes and create a more welcoming America that provides fair process for immigrants through litigation, research, legislative and administrative advocacy, and communications. *Id.* The Council supports immigrants facing removal both through direct representation and by providing training and assistance to attorneys representing noncitizens impacted by immigration detention and removal.

*Id.* ¶¶ 4, 6. The Council also pursues litigation challenging federal and state policies that harm immigrant communities, represents noncitizens seeking to hold the government accountable for violations of their rights, litigates habeas petitions, and files and litigates Freedom of Information Act requests to demand transparency from immigration agencies. *Id.* ¶ 6. The Council also has a Diversity, Equity, and Inclusion plan to help scale the organization's impact and reach in furtherance of its mission. *Id.* ¶ 12. Several current employees of The Council are pursuing loan forgiveness through PSLF, and the Rule threatens The Council's ability to recruit the skilled attorneys and other staff needed to execute its mission. *Id.* ¶¶ 16–17.

Plaintiff LULAC Institute, Inc., (LULAC) is a section 501(c)(3) tax-exempt organization. Proaño Decl. ¶ 2. LULAC's mission is to serve Hispanic Americans in the United States and Puerto Rico through community-based programs that focus on economic conditions, educational attainment, political influence, housing, health, and civil rights, with programs that range from citizenship drives to education and health events that empower the Hispanic community at the local, state, and national levels. *Id.* LULAC provides programs to advance opportunity for Latino youth, such as the LULAC Academy that hosts hundreds of young Latino adults who partake in workshops and sessions regarding health and technology, as well as over 82 programs across the United States for college readiness and preparedness with the goal for Latino students to attain on-time graduation and a pathway to higher education. *Id.* ¶ 3. LULAC provides programs that offer assistance for those going through the citizenship application process, including toolkits that provide knowledge about the rights of undocumented individuals directed toward both undocumented individuals and those who provide various forms of assistance to them. *Id.* ¶ 4. LULAC also operates several health initiatives, including Latinos Living Healthy, which is dedicated to educating and informing the Latino communities about health issues within the

community while providing resources to individuals who otherwise may not have access to them. *Id.* ¶ 5. LULAC does not ask individuals who participate in its programs to provide their immigration status, and it has aided immigrants of unknown status through its programs. *Id.* ¶ 6. LULAC also operates certain programs, such as its Women's Empowerment Program, that are targeted only towards women. *Id.* ¶ 14. LULAC employees have obtained loan forgiveness through PSLF, and LULAC highlights its status as a PSLF eligible employer in recruiting, because the availability of PSLF is a selling point in recruitment. *Id.* ¶¶ 7–9.

Each Plaintiff's activities and advocacy work, particularly work that relates to immigration, Diversity, Equity, and Inclusion (DEI), or providing services to or offering programs for specific groups of people, is potentially subject to investigation and punishment under the Rule's broad and amorphous prohibitions on "aiding or abetting" civil violations of immigration and antidiscrimination law. In addition, KHRC's international work and The Door's provision of gender-affirming healthcare to 18-year-olds potentially subject them to punishment under the prohibitions on "supporting terrorism" and "castration or mutilation of children." Plaintiffs brought this lawsuit to vindicate their unqualified right under the PSLF statute to participate in PSLF as 501(c)(3) organizations.

## LEGAL STANDARD

The Administrative Procedure Act (APA) provides for judicial review of final agency actions, 5 U.S.C. §§ 702, 704, and directs courts to vacate such actions if they are, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C); or "contrary to constitutional right," *id.* § 706(2)(B). "In an APA case, summary judgment 'serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard

of review.'" *Al-Eryani v. Immigrant Investor Prog. Off.*, 754 F. Supp. 3d 101, 104 (D.D.C. 2024) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)). Summary judgment is appropriate "if the moving party 'shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

## ARGUMENT

### I.    Plaintiffs have standing to challenge the PSLF Rule.

"To establish Article III standing, a plaintiff must show that it 'suffered or is imminently threatened with a concrete and particularized injury in fact that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision.'" *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014)) (cleaned up). Plaintiffs satisfy each of these requirements.

"'[T]here is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." *State Nat. Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992)). That general principle applies here, because the PSLF Rule directly regulates Plaintiffs: It "imposes specific requirements on [them] and expressly warns of clear consequences for noncompliance." *Planned Parenthood of Greater N.Y. v. HHS*, No. CV 25-2453, 2025 WL 2840318, at *10 (D.D.C. Oct. 7, 2025); *see also Corbett v. TSA*, 19 F.4th 478, 484 (D.C. Cir. 2021) (plaintiff had standing because he was "within the regulated class of persons covered by the disputed directives" and faced sanctions if he failed to comply). Indeed, the Department's Regulatory Impact Analysis acknowledges that compliance with the PSLF Rule may require some employers to make "operational adjustments." PSLF Rule, 90 Fed. Reg. at 48993.

The PSLF Rule requires 501(c)(3) employers, such as Plaintiffs, to "certify that [they] did not participate in activities with a substantial illegal purpose" on pain of being deemed to have a substantial illegal purpose and therefore losing their status as a qualifying employer. PSLF Rule, 34 C.F.R. §§ 685.219(i)(1)(i), (h). The Rule also establishes a process for employers to "regain[] eligibility as a qualifying employer. *Id.* § 685.219(j). And it expressly prohibits borrowers from requesting reconsideration of a determination terminating their employer's "status as a qualifying employer due to engaging in activities that have a substantial illegal purpose." *Id.* § 685.219(g)(7). The PSLF Rule also permits the Secretary to independently strip organizations of eligibility by determining whether an employer has "engaged in activities such that it has a substantial illegal purpose." 34 C.F.R. § 685.219(i)(1)(ii). Plaintiffs face loss of PSLF eligibility if they do not comply with the Rule, with direct costs to their recruitment and retention of staff.

That harm is particularly acute because, as further explained below, *see* pp. 29–34, the Rule is drawn in such broad and vague terms that Plaintiffs lack meaningful notice of what conduct is prohibited or how the Department will view their activities. Plaintiffs must therefore engage with legal counsel to determine the risk of enforcement action by the Department. Perez Decl. ¶ 16; Proaño Decl. ¶ 18; Louie Decl. ¶ 15; Loweree Decl. ¶ 13. Even if legal counsel concludes that certain programs are lawful under established precedent, the risk that the Department may take a different view of the law could prevent plaintiffs like from engaging in programs in furtherance of their missions. Perez Decl. ¶ 16; Louie Decl. ¶ 18; Loweree Decl. ¶ 12. For example, KHRC's Young Women's Leadership Summit is open to women, and its John Lewis Young Leaders Program is open to all but prioritizes students attending an HBCU, HSI, or HMSI, as well as students from marginalized communities. Perez Decl. ¶¶ 5, 6. KHRC also engages in advocacy and legal support activities beyond direct legal representation, such as its Civic Spaces Case-

Tracker, *id.* ¶ 11, and it operates programs in Venezuela and throughout Africa, Latin America, and the Caribbean, *id.* ¶ 12. Because the Department's enforcement discretion under the Rule is not bound by any established legal precedent, all of those programs are at risk of being deemed to aid or abet violations of immigration or antidiscrimination laws, or even to constitute "supporting terrorism." *Id.* ¶¶ 11–13. At a minimum, KHRC will need to engage costly outside counsel to assess its programs and operations and to determine the risk of enforcement action under the Rule. *Id.* ¶¶14, 16. LULAC likewise faces uncertainty over how the Department will view its programs aimed at benefiting Latino communities, regardless of immigration status, or its programs targeted towards women, and faces the risk that the Department could consider those programs to constitute aiding and abetting violations of immigration or antidiscrimination laws. Proaño Decl. ¶ 16. The Door provides direct support, including legal representation, healthcare, housing support, and career guidance to undocumented youth, as well as gender-affirming care to individuals aged 18 and over, consistent with New York and federal law. Louie Decl. ¶¶ 4, 6, 14. The Rule threatens to disrupt The Door's ability to provide those services in furtherance of its mission, because it cannot rely on established legal precedent to assess the risk of enforcement action by the Department. *Id.* ¶¶ 13–14. The Council also engages in direct representation of individuals facing removal, as well as impact litigation and advocacy and organizing work to support immigrant communities, and training and support for attorneys engaged in direct representation of individuals in immigration proceedings. Loweree Decl. ¶¶ 3–6. The Council also maintains an internal DEI plan. *Id.* ¶ 12. The Council faces uncertainty over whether the Department will consider its activities to constitute aiding and abetting violations of immigration or antidiscrimination laws. *Id.* ¶¶ 10–12.

Plaintiffs also have standing because they face substantial monetary costs to comply with the Rule—"a classic pocketbook injury sufficient to give [them] standing." *Tyler v. Hennepin Cnty., Minnesota*, 598 U.S. 631, 636 (2023). Compliance costs that a plaintiff "reasonably incur[s] to mitigate or avoid" a "'substantial risk' that harm will occur" are sufficient for standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (quoting *Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 153–54 (2010)). The Department itself recognizes that employers will face "[c]ompliance costs" that may vary "depending on the organization's size and complexity," with some employers likely to face "higher costs" for "legal counsel, restructuring efforts, and changes to the organization's documentation processes." PSLF Rule, 90 Fed. Reg. at 48993; *see also id.* (acknowledging that the PSLF Rule "may necessitate" employers to "consult[] with legal counsel"). Those costs are reasonably necessary to avoid the harm of losing eligibility as a qualifying employer for PSLF. And Plaintiffs are indeed incurring—or imminently will incur—such costs.

The Council, for instance, has already commenced compliance preparations ahead of the Rule's July 1, 2026, effective date, and estimates total compliance costs of $20,000 to $26,000, including staff time and costs for outside counsel. Loweree Decl. ¶¶ 8, 13. LULAC will commence its compliance efforts in April 2026 and anticipates spending between $4,000 to $6,000 on outside counsel. Proaño Decl. ¶ 18. KHRC will begin its compliance preparations in May or June 2026 to be able to complete the new ECF for its employees by the July 1, 2026 effective date. Perez Decl. ¶ 15. Based on past experiences with obtaining outside legal counsel for compliance-related matters, KHRC estimates costs from $10,000-$20,000 to hire outside counsel to assist with this matter. *Id.* ¶ 14. Based on prior experience engaging outside legal counsel, The Door estimates

that it will cost $70,000 annually to hire outside counsel, and plans to begin the compliance preparation process by April 2026. Louie Decl. ¶¶ 16–17.

In short, Plaintiffs' injuries are directly traceable to the PSLF Rule, which imposes new obligations and compliance costs, and their injuries are redressable by an order of this Court setting aside the PSLF Rule.

## II.    The PSLF Rule is contrary to law and exceeds the Department's statutory authority.

On the merits, the Rule is contrary to law and beyond the Department's statutory authority because, by statute, all 501(c)(3) organizations, without qualification, are eligible to participate in PSLF. The PSLF statute provides that the Secretary of Education "*shall* cancel the balance of interest and principal due" on "*any* eligible Federal Direct Loan not in default" for a borrower who (i) makes 120 qualifying monthly payments, (ii) "is employed in a public service job at the time of such forgiveness" and (iii) has been employed in a public service job during the period in which the borrower makes each of the 120 [qualifying] payments." 20 U.S.C. § 1087e(m)(1) (emphasis added). And it unambiguously provides that "[t]he term 'public service job' means," among other things, "a full-time job … at an organization that is described in section 501(c)(3) of Title 26 and exempt from taxation under section 501(a) of such title." *Id.* § 1087e(m)(3)(B)(i).

That statutory language leaves no discretion to the Secretary to decline to forgive loans for any borrower who makes the necessary qualifying payments and works at any 501(c)(3) organization. All 501(c)(3) organizations are qualifying employers under the statute, and the statute unambiguously directs that the Secretary "shall" forgive qualifying loans. "Ordinarily, legislation using 'shall' indicates a mandatory duty." *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016). That inference is particularly strong "[w]hen a statute distinguishes between 'may' and 'shall,'" *Kingdomware Techs., Inc. v. U.S.*, 579 U.S. 162, 172 (2016), as the PSLF statute does. *See, e.g.*, 20 U.S.C. § 1087e(b)(9)(C) (stating "the Secretary *may*

provide for an interest rate deduction" in certain circumstances (emphasis added)). Thus, the statute affords the Secretary no discretion when it comes to forgiving qualifying loans of the employees of a 501(c) entity.

In *Western Minnesota Municipal Power Agency v. FERC,* 806 F.3d 588 (D.C. Cir. 2015), the D.C. Circuit rejected a similar effort by an agency to impose extra-statutory policy-based limits on clear statutory text. There, a statute provided that the Federal Energy Regulatory Commission "*shall give preference* to [certain] applications … by States and municipalities." *Id.* at 592 (quoting 16 U.S.C. § 800(a)). FERC attempted to withhold that preference from a municipality seeking a permit for a project "almost 400 miles from" the municipality, arguing that "it is difficult to discern what public interest is served by giving a municipality a preference with respect to a project that is far from the site of the municipality." *Id.* at 591. The D.C. Circuit rejected FERC's argument, holding that "nothing in [the statutory] language qualifies or restricts which 'states' or which 'municipalities' are to be favored," and that the use of the word "shall" indicates a mandatory "duty to prefer municipalities … not an invitation for the Commission to determine when preferring a particular municipality would serve the public interest as the Commission sees it." *Id.* at 592.

The Rule states that the Department has the statutory authority to exclude otherwise eligible organizations from PSLF because "Congress would not want PSLF benefits to be received by employees of organizations that the Department knows are not serving the public interest," PSLF Rule, 90 Fed. Reg. at 48971–72. The Department's argument is of a piece with FERC's invocation of the public interest in *Western Minnesota*, and no more persuasive. As in *Western Minnesota*, the PSLF statute is written in unqualified, unrestricted terms to include all 501(c)(3) organizations within the scope of PSLF. Nothing in the statute delegates to the Department authority to restrict

eligibility to only those 501(c)(3) organizations that "serve the public interest as the [Department] sees it." *Western Minnesota*, 806 F.3d at 592. Legislative history also supports this conclusion; even opponents of the PSLF statute recognized that employment at *all* 501(c)(3) organizations qualified as a public service job. 153 Cong. Rec. H7556 (daily ed. July 11, 2007) (statement of Rep. Peter Roskam) (criticizing PSLF as a "blanket program for nonprofits").

The Department points out that there is overlap between several of the categories of public service jobs enumerated in the statute, such as between the "law enforcement" and "government" categories, and the "public interest law services" and 501(c)(3) categories. PSFL Rule, 90 Fed. Reg. at 48972. Based on that overlap, the Department concludes that Congress's intention was "to broadly ensure that all professions that advance the public interest were included in the list," *id.* and that "[s]urely, Congress would not want to reward organizations that break the law and have a substantial illegal purpose" by allowing them to participate in PSLF, *id.* The flaws in the Department's reasoning are obvious: The PSLF statute's broad enumeration of eligible employment categories reflects Congress's decision to broadly include within PSLF professions that advance the public interest. But it does not follow that Congress empowered the Department to *exclude* employers that satisfy the statutory enumeration based on the Department's own independent assessment of the public interest. To the contrary, the fact that Congress chose to enumerate specific categories rather than leaving the term "public service job" undefined strongly indicates that Congress conclusively resolved the question of which employers sufficiently advance the public interest to warrant inclusion in PSLF: *all* employers that fall within the enumerated criteria, including all 501(c)(3) organizations.

The Department has asserted that sticking to the literal terms of the statutory enumeration could result in organizations with substantial illegal purposes retaining PSLF eligibility, such as if

an organization had its 501(c)(3) status revoked by the IRS but continued to satisfy another of the statutory criteria. As an example, the Department posits the possibility that an organization providing State-funded pre-kindergarten services could be stripped of its 501(c)(3) status after a finding by the IRS that it has a substantial illegal purpose, but nevertheless remain eligible for PSLF under the enumerated "early childhood education" category. *See* PSLF Rule, 90 Fed. Reg. at 48972. Alternatively, the Department suggests that the IRS may fail to take action against a 501(c)(3) organization with a substantial illegal purpose, allowing its tax-exempt status—and thus PSLF eligibility—to continue. *Id.* The statute reflects however, that Congress trusted the IRS to do its job, and does not empower the Department to second-guess the IRS's determinations. The Department's policy disagreements with the statute as written are "better directed to Congress." *Gross v. United States*, 771 F.3d 10, 13 (D.C. Cir. 2014).

To support the Rule, the Department invoked the "illegality doctrine," under which, it claimed, "courts and the IRS have established that revocation of statutory benefits to organizations engaged in illegal activities is proper if [their] purposes and activities are illegal or otherwise contrary to public policy." PSLF Rule, 90 Fed. Reg. at 48971. The illegality doctrine, however, does not give authority to *other agencies* to strip nonprofit organizations of tax-exempt status or any benefits conferred by statute. Rather, as the authorities cited by the Department illustrate, *the IRS* has the power to strip *tax-exempt status* from an organization whose "activities demonstrate an illegal purpose which is inconsistent with charitable ends," Revenue Ruling 75-384, 1975-2 C.B. 204,[8] or, "where there can be no doubt that the activity [of the organization] is contrary to a fundamental public policy," from an organization whose activities are not illegal, *Bob Jones Univ. v. United States*, 461 U.S. 574, 592 (1983). The IRS has authority to do so under section 501(c)(3)

---

[8] Rev. Rul. 75-384, 1975-2 C.B. 204, *available at* https://www.irs.gov/pub/irs-tege/rr75-384.pdf

of the Internal Revenue Code, which provides for tax exemption for "[c]orporations … organized and operated exclusively for religious, charitable … or educational purposes." 26 U.S.C. § 501(c)(3). The requirement that an organization be "charitable" to qualify for tax exemption "underl[ies] all relevant parts of the Code," and the meaning of the term "charitable" is informed by the law of charitable trusts. *Bob Jones Univ.*, 461 U.S. at 586, 588. Thus, the IRS's power to strip tax-exempt status from organizations whose activities demonstrate an illegal purpose inconsistent with charitable ends, or whose activities are contrary to fundamental public policy, is rooted in—and limited by—the statutory text of section 501(c)(3). The IRS's authority to do so does not confer on the Department of Education, or any other federal agency, authority to revoke any other statutory benefit on the same basis.

The Department argues that "[t]he way the IRS interprets the Internal Revenue Code is very similar to what the Department is doing in interpreting the phrase 'public service.'" PSLF Rule, 90 Fed. Reg. at 48975. But the IRS's role in administering the Internal Revenue Code is entirely different from the Department's role in administering the PSLF program. Section 501(c)(3) limits the availability of tax exemptions to organizations that satisfy the common-law standard for qualifying as "charitable." *Bob Jones Univ.*, 461 U.S. at 588 n.12. Applying that standard necessarily entails the exercise of judgment based on the particular facts of each case. And the Department has conceded that the determination whether an organization is "described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title," 20 U.S.C. § 1087e(m)(3)(B)(i), is "made by the IRS," PSLF Rule, 90 Fed. Reg. at 48972. In contrast, the PSLF statute supplies a bright-line rule that allows employees at all 501(c)(3) organizations to participate in the PSLF program. The Department need only confirm that the IRS has in fact

granted tax-exempt status to a particular organization; the statute gives it no authority to inquire into whether the IRS was correct in making that determination.

In sum, the PSLF statute is clear that all 501(c)(3) organizations are eligible employers for purposes of PSLF. The statutory text provides no leeway for the Department to restrict eligibility based on its own conception of sound public policy, and the illegality doctrine does not license the Department to rescind access to statutory benefits that Congress expressly provided. The PSLF Rule is thus contrary to law and in excess of the Department's statutory authority.

## III.    The PSLF Rule is arbitrary and capricious.

The APA's arbitrary and capricious standard "requires that agency rules be reasonable and reasonably explained." *Nat'l Telephone Co-op. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009). Courts must thus review agency action to ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 719 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). If an agency's reasoning is "illogical on its own terms," the agency's action is arbitrary and capricious. *Am. Fed'n of Gov't Emps. v. FLRA*, 470 F.3d 375, 380 (D.C. Cir. 2006).

The PSLF Rule fails that basic rationality review. There is no rational connection between any facts found and the choice to promulgate the Rule. The Department attempts to justify the Rule as "necessary" to "reduc[e] improper payments and increase[e] transparency, program integrity, and taxpayer protection," but it fails to identify any factual basis to support its assertion of such a necessity. PSLF Rule, 90 Fed. Reg. 48968. The Rule is illogical on its own terms, both in its application of criminal accessory liability to civil statutory violations and in its selection of "illegal activities" to target.

### A.    The Rule has no rational connection to the factual record.

The Department claims that the Rule will "strengthen the program's integrity, improve its efficiency, and ensure that taxpayer funds are allocated appropriately," thereby addressing unspecified "challenges" that the program has had in the past with "the disbursement of benefits to borrowers employed by organizations whose activities do not align with the program's public service objectives." PSLF Rule, 90 Fed. Reg. at 48993. But tellingly, the Department never specifies the details of any such challenges or identifies any instance—ever—of an illegal organization benefitting from participation in PSLF. The Department's fanciful hypothetical about a State-funded pre-kindergarten provider operating not merely as a criminal organization, but as a criminal organization dedicated specifically to violating federal antidiscrimination or immigration law, supporting terrorism, mutilating or trafficking children, or violating State disorderly protest laws, falls far short of the necessary rational connection between facts found and choices made.[9]

The Department's failure to identify even a single instance of the problem it purports to address in the Rule likely results from the fact—pointed out by many commenters—that existing laws already prohibit organizations from engaging in illegal activity. *See* PSLF Rule, 90 Fed. Reg. at 48974. The Department's responses to these comments are not persuasive. First, the Department states that it cannot rely on the IRS alone to police non-profits, because the IRS faces resource constraints, meaning that "at least at times, the illegality doctrine will be underenforced." *Id.* That response ignores the Department's obligation to connect its rulemaking decisions to actual facts. And the factual record is devoid of evidence of underenforcement by the IRS. Second, the Department points out that its "interest here stands separate and apart from any interest the IRS

---

[9] It is an indication of the Rule's incoherence that the most obvious form of criminal activity that could lead to a determination by the IRS that a pre-kindergarten provider has a substantial illegal purpose—financial fraud—is not one of the categories of illegal activity covered by the Rule.

has in taking action to revoke tax-exempt status, because Congress assigned the Department the responsibility to administer and oversee the PSLF program." *Id.* But whether the Department's interest in overseeing the PSLF program is "separate and apart from" the IRS's interest in enforcing the tax code does not justify the Rule, so long as the IRS (as the nonexistent factual record suggests) is vindicating whatever interest the Department may have. Finally, the Department dismisses the role of State governments in curbing illegal activities by non-profit organizations, contending that "State action has no bearing on eligibility for the PSLF program." *Id.* That response again misses the point. State law enforcement activity prevents federal funds from flowing to illegal organizations not by rendering the organizations formally ineligible for participation in federal programs, but rather by deterring and addressing the underlying illegal conduct that the Department presumes to exist (but fails to establish). So long as State enforcement activity is adequate to that task—as the absence of any factual record suggests that it is—the Rule remains a solution in search of a problem.

The Department's forward-looking projection of the benefits of the Rule is likewise untethered to the factual record. The Department estimates—based on no identified facts—"that it will take action to remove eligibility for less than ten organizations per year." PSLF Rule, 90 Fed. Reg. at 48971. Even accepting the Department's ipse dixit as a generous upper-bound estimate of the plausible benefits of the Rule, rooting out ten "illegal" organizations per year would be trivial compared to the overall universe of nonprofit employers. In fiscal year 2024, there were 1,548,798 501(c)(3) organizations recognized by the IRS—all of them eligible for PSLF.[10] Thus, in the best-

---

[10]  IRS Data Book Table 14, Tax-exempt organizations and nonexempt charitable trusts, https://www.irs.gov/statistics/soi-tax-stats-tax-exempt-organizations-and-nonexempt-charitable-trusts-irs-data-book-table-14 (the relevant table for each fiscal year downloads as a separate Microsoft Excel file).

case scenario for the Department, the Rule will have a discernable impact on less than one out of every 150,000 organizations. And although the Department suggests that the impact will be larger because the Rule will deter organizations from engaging in illegal activities, it does not attempt to quantify that effect, or to compare it to the existing deterrent effect of state and federal law enforcement action. *See* PSLF Rule, 90 Fed. Reg. at 48996.

### B.    The Rule is illogical on its own terms.

The Rule is also illogical on its own terms. Its most glaring internal contradiction is that, in purporting to target organizations engaged in illegal activities, the Department has—apparently without realizing it—penalized conduct that is not illegal. *See, e.g.*, ED_00306 (Comment of the University of California). The Rule does so by applying the criminal law concept of "aiding and abetting" to civil as well as criminal violations of federal immigration and antidiscrimination laws. *See* 34 C.F.R. § 685.219(b)(1) (giving aiding or abetting the same meaning as in 18 U.S.C. § 2); *id.* § 685.219(b)(30) (defining "substantial illegal purpose" to include "aiding or abetting violations" of "Federal immigration laws," as well as "engaging in a pattern of aiding or abetting illegal discrimination" in violation of federal antidiscrimination law). But it is not illegal to aid or abet civil violations of federal immigration or antidiscrimination law. "Congress has not enacted a general civil aiding and abetting statute," *Central Bank of Denver, N.A., v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994), and the Department has not identified any aiding-and-abetting statute specific to the immigration or antidiscrimination contexts (hence its reliance on 18 U.S.C. § 2). The Rule, therefore, penalizes fully lawful conduct that supports purely civil statutory violations by third parties. For example, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona v. United States*, 567 U.S. 387, 407 (2012). It is thus also not illegal to "aid or abet" a removable alien in remaining present in the United States, yet an organization that the Department determines to have done so now risks penalization under

25

the Rule.[11] Likewise, this administration takes the view that it is illegal for an employer to sponsor employee affinity groups whose membership is not open to all employees.[12] There is nevertheless no law against encouraging employers to form employee resource groups based on membership in marginalized communities, or to assist employers in implementing such DEI policies.

In defending its use of the criminal aiding-and-abetting standard, the Department ignores the distinction between civil and criminal violations and, in so doing, renders the relevant portions of the Rule practically unintelligible. The Department insists that "the concept of aiding and abetting is purposefully broad as it prohibits assisting in numerous types of criminal activity, but it is well understood by courts and the public." PSLF Rule, 90 Fed. Reg. at 48980. But the criminal aiding-and-abetting statute is well understood only with respect to criminal activity. In contrast, the common-law concert of action principle, "a doctrine with rough similarity to criminal aiding and abetting," has been "at best uncertain in application," and the "common-law precedents [have] 'largely been confined to isolated acts of adolescents in rural society.'" *Central Bank of Denver*, 511 U.S. at 181 (quoting *Halberstam v. Welch*, 705 F.2d 472, 489 (D.C. Cir. 1983)). There is thus no settled or well-understood general civil-law principle of accessory liability, and by shoehorning

---

[11] The PSLF Rule does identify a criminal immigration law when discussing federal immigration laws, 90 Fed. Reg. at 49001 (34 C.F.R. § 685.219(b)(30)(i) (citing 8 U.S.C. § 1325)), but its scope is not limited to criminal laws, id. 34 C.F.R. § 685.219(b)(17). In addressing comments requesting more precise language, the Department declined to narrow the scope of federal immigration laws—civil or criminal—that could give rise to a determination of aiding and abetting liability under the new Rule. 90 Fed. Reg. at 48982 ("The phrase 'Federal immigration law' is broad, but it is easily understood and only applies to Federal law that regulates immigration). The Department did not address directly any of the comments that raised the issue of applying aiding and abetting liability to violations of civil immigration law. See, e.g., ED-2025-OPE-0016-9590 (statement of Oliver Santos); ED-2025-OPE-0016-7442 (statement of Rachel Smith).

[12] U.S. Equal Emp. Opportunity Comm'n, What You Should Know About DEI-Related Discrimination at Work, https://www.eeoc.gov/wysk/what-you-should-know-about-dei-related-discrimination-work (last accessed February 9, 2026).

the criminal-law concept into the civil context, the Department has created a host of novel legal issues without even displaying any awareness of having done so.

The Department's response to concerns that "entities providing indirect support, such as legal advice, medical care, or humanitarian assistance" could be disqualified from PSLF illustrates the problem. PSLF Rule, 90 Fed. Reg. at 48980. The Department asserts that "ordinary, lawful assistance"—a category in which it includes "legal advice, medical care, or humanitarian support"—will not trigger disqualification. *Id.* That is because, per the Department, "[t]he term 'aiding and abetting' carries a settled legal meaning: intentional participation in unlawful activity. It does not cover lawful support or incidental association." *Id.* But when organizations go "beyond lawful support or incidental association" and instead "are enabling or encouraging others to engage in certain unlawful activities," they will be disqualified under the Rule. *Id.* That attempted line-drawing makes sense in the context of the criminal law, where assistance rising to the level of aiding and abetting is itself a crime. In that context, there is a meaningful distinction between incidental lawful assistance and assistance rising to the level of enabling and encouraging the activity of another. The distinction makes no sense, however, in the context of civil violations: It is generally not illegal to aid or abet purely civil violations of federal immigration or antidiscrimination laws, so the Department's attempt to distinguish between organizations providing incidental "lawful" support and those that cross the line into enabling and encouraging is incoherent. All such assistance is "lawful."

The Department's failure to grasp the importance of the distinction between civil and criminal violations is not merely a conceptual error. It renders the Department's guidance unintelligible, because the Department is unable to explain what separates acceptable from unacceptable levels of support. The Department has determined that providing "humanitarian

assistance" or "medical care" falls on the legal side of the line, but it cannot explain, for example, why such assistance could not equally be construed as "enabling" or "encouraging" an alien subject to removal to remain in the United States. And the Department cannot rely on established judicial precedent to fill in the gaps in its reasoning, because judicial precedent on aiding and abetting concerns either criminal law violations or specific civil contexts which Congress has provided for by statute. *Central Bank of Denver*, 511 U.S. at 182 (Congress "has taken a statute-by-statute approach to civil aiding and abetting liability."). Those inapposite bodies of precedent provide no guidance in determining when an organization's efforts cross the line from permissible assistance to impermissible enabling and encouraging.

The Rule is also illogical in its selection of targeted activities. For example, the Rule makes ineligible organizations that "engage in a pattern of aiding or abetting" violations of antidiscrimination laws, but *not* organizations that directly engage in illegal discrimination. *See U.S. v. Brown*, 7 F.3d 1155, 1163 (5th Cir. 1993) ("once cannot aid and abet oneself."). And the Rule penalizes "surgical castration or mutilation of children," which it defines as "surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex"—but not the same, or even more consequential, procedures carried out for any other purpose. The Rule also penalizes "the trafficking of children" if the purpose is "emancipation from their lawful parents in violation of Federal or State law," but not for any other purpose.

The Department does not even attempt to offer any principled explanation for the Rule's inclusions and exclusions, instead deferring to the Executive Order instructing the Department to revise the PSLF regulations, which the Department "understands … as being a directive from the President regarding how he would like the Department to exercise our prosecutorial discretion in

taking enforcement actions." PSLF Rule, 90 Fed. Reg. at 48976. But the Executive Order did not require the Department to write the Rule that it chose to write, and it made no mention at all of prosecutorial discretion. The irrationality of the Department's choices cannot be brushed aside by referencing the Executive Order, and those choices reflect the lack of reasoned decisionmaking in the Rule as a whole. *See Kingdom v. Trump*, No. 25-cv-691-RCL, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025) ("[T]he fact that an agency's actions were undertaken to fulfill a presidential directive does not exempt them from arbitrary-and-capricious review."); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 294–95 (E.D. La. 2022) ("A decision supported by no reasoning whatsoever in the record cannot be saved merely because it involves an Executive Order.").

## IV.    The PSLF Rule is impermissibly vague in violation of the Due Process Clause.

The Fifth Amendment's Due Process Clause prohibits regulations that are so vague that they fail to "give [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Fifth Amendment requires "first, that the regulated parties should know what is required of them so they may act accordingly; second, precision and guidance … so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations*, 567 U.S. 239, 253 (2012). Those concerns apply with particular force when a vague regulation implicates the speech rights of regulated parties, because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of that forbidden area were clearly marked." *Grayned*, 408 U.S. at 109 (cleaned up). Thus, when a vague regulation threatens to chill protected speech, "a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

As a threshold matter, Plaintiffs may invoke the Fifth Amendment's protections because they have a constitutionally cognizable property interest in their eligibility for the PSLF program.

The Due Process Clause protects property interests in statutory benefits when the state or federal law giving rise to the claimed property interest gives the person claiming the benefit "a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Plaintiffs' entitlement to participate as employers in the PSLF program in their capacity as 501(c)(3) organizations satisfies that test. Participation in PSLF is a valuable benefit to employers as well as employees. "By design," PSLF "facilitates a public service organization's recruitment of employees by reducing their employees' long-term debt burden," and "reduces pressure on public service organizations to raise salaries," and it thereby "allows public service organizations to attract and retain desirable employees." *Am. Bar Ass'n*, 370 F. Supp. 3d at 19. The Department agrees, repeatedly characterizing PSLF participation as a form of subsidy for public interest employers. *See, e.g.*, PSLF Rule, 90 Fed. Reg. at 48969, 48984, 48985, 48987. Plaintiffs' interest in the benefit rises to the level of entitlement, because the PSLF statute makes all 501(c)(3) organizations eligible to participate in PSLF without exception.

Although the Court in *American Bar Ass'n* held that an employer that was *not* a 501(c)(3) organization did not have a protected property interest in its status as an eligible employer for PSLF, *see Am. Bar Ass'n*, 370 F. Supp. 3d at 36–37, that case is readily distinguishable. Indeed, its reasoning supports Plaintiffs here. The American Bar Association is not a 501(c)(3) organization, and its participation in PSLF was terminated when the Department determined that it did not qualify as a "provider of public interest law services" as the term is defined in the PSLF regulations. *Id.* at 14. The court reasoned that the PSLF statute did not create an entitlement to participation in PSLF "*for the ABA*," but distinguished the ABA's position from PSLF's creation of an "entitlement to debt relief for borrowers determined to be eligible." *Id.* at 36–37 (emphasis in original). Plaintiffs' position here is more akin to that of the borrowers than that of the ABA:

30

They have been determined by the IRS to be eligible for tax-exemption under Section 501(c)(3), and the PSLF statute supports their claim of entitlement to participate in PSLF.[13]

As commenters pointed out, *see, e.g.*, ED_00492 (Comment of KHRC); ED_00231 (Comment of Tzedek DC), the Rule is fatally vague under the Due Process Clause. That is so for many of the same reasons that it is arbitrary and capricious: It fails to provide guidance for regulated employers because the Department did not even attempt to explain how the criminal-law concepts of aiding and abetting map onto civil-law violations to which those concepts have never applied. Neither the Rule itself nor any outside body of judicial precedent can authoritatively tell regulated employers in advance how to tell the difference between lawful "assistance" and unlawful "enabling" and "encouraging."

Likewise, the Rule does not merely invite arbitrary and discriminatory enforcement but practically requires it. Because the Rule operates at the previously unexplored intersection of criminal accessory liability and substantive civil immigration and antidiscrimination statutes, it is all but "unavoidable that agency decisionmakers will 'shap[e] a vague [rule's] contours through their enforcement decisions.'" *Nat'l Ass'n of Diversity Offs. in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 278 (D. Md. 2025) (quoting *Sessions v. Dimaya*, 584 U.S. 148, 182 (2018) (Gorsuch, J., concurring)).

---

[13] The terms of the PSLF statute would be sufficient to support a property right triggering the Due Process Clause's protections even if all 501(c)(3) organizations were not automatically eligible to participate in PSLF. Just as the welfare recipients in *Goldberg v. Kelly*, 397 U.S. 254 (1970), had a "claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them" that was sufficiently strong to require a "right to a hearing," even though "[t]he recipients had not yet shown that they were, in fact, within the statutory terms of eligibility," *Bd. of Regents*, 408 U.S. at 578, Plaintiffs here have a sufficiently clear claim of statutory entitlement to participate in PSLF to implicate the Due Process Clause even if they are ultimately determined not to be eligible.

The Rule's vagueness does not end with its unclear definition of illegal activity. To exclude an employer from PSLF eligibility under the Rule, the Department must not only determine that an organization has engaged in specified illegal activities, but also that it has done so "such that it has a substantial illegal purpose," which the Department must determine "by considering the materiality of any illegal activities or actions." 34 C.F.R. § 685.219(h). As the Department explains, that standard amounts to an ad-hoc all-things-considered balancing test that does not meaningfully constrain the Department's decisionmaking or provide guidance for regulated organizations. The Department "will weigh the frequency with which [illegal activities] have occurred and the seriousness of the offense"; if the "illegal conduct is material and very serious, such as acts of terrorism, the Department may not need to see a pattern of behavior," but "[o]n the other hand, if the organization has engaged in less serious violations, the Department may need to see a pattern and practice of consistent violations to find that the organization has engaged in activities such that it has a substantial illegal purpose." PSLF Rule, 90 Fed. Reg. at 48988. On still another hand, though, the Department suggests that "more than an insubstantial amount of illegal conduct" (perhaps regardless of seriousness, the Department does not say) is sufficient for exclusion. *Id.* at 48989. Aside from specifying that terrorist offenses qualify as particularly serious, the Department offers no guidance as to how it understands the relative seriousness of the Rule's enumerated activities. Nor does it offer any guidance as to what amount of activity constitutes a "pattern" (or whether the analysis varies between activities that include the term "pattern" in their definition, such as the Rule's prohibition in engaging in a pattern of aiding and abetting illegal discrimination, and those that do not), or how much prohibited activity is "more than insubstantial."

Responding to comments that made these points, the Department asserts that its approach cannot be vague because courts have upheld a similar approach by the IRS. *See* PSLF Rule, 90 Fed. Reg. at 48989 (citing *Church of Scientology v. Comm'r*, 83 T.C. 381, 586 (1984). The case on which the Department relies, however, dismissed a vagueness challenge on standing, not on the merits. *See Church of Scientology*, 83 T.C. at 466. In any event, the point on which the Department relies, that the government has an affirmative "interest in not subsidizing criminal activity," *id.* at 507, does not apply here, because the Rule applies to fully lawful conduct in support of purely civil statutory violations, not only to criminal conduct. Regulated organizations thus lack the kind of guidance that the criminal law supplies in the context of IRS enforcement activities.

Adding yet further unpredictability, the Department has expressly rejected the possibility of relying "only on final judicial or administrative rulings before taking action," PSLF Rule, 90 Fed. Reg. at 48987, except to find a pattern of violating state law, which requires a "final, non-default judgment by a State court," 34 C.F.R. § 685.219(b)(34). As a result, regulated organizations can neither count on independent adjudication of the relevant facts, nor conduct themselves in reliance on established judicial precedent interpreting the relevant statutes. Employers like The Council, for example, may reasonably fear that their internal DEI policy, although consistent with judicial understandings of antidiscrimination law, may run afoul of this administration's idiosyncratic interpretation of the law. *See, e.g.*, *Nat'l Ass'n of Diversity Offs.*, 767 F. Supp. 3d at 285 (noting that "[t]he White House and the Attorney General have made clear" that "viewpoints and speech considered to be in favor of or supportive of DEI" are "viewpoints the government wishes to punish and, apparently, extinguish.").

The Rule's layer upon layer of vagueness and unrestricted administrative discretion warrant particularly close scrutiny because, as detailed below, the Rule threatens to chill protected

speech. *See Vill. of Hoffman Ests.*, 455 U.S. at 499. Although little is clear about how the Department intends to police the line between "lawful support" and prohibited aiding or abetting of civil violations, the Rule leaves no doubt that the Department understands "enabling or *encouraging* others" to violate even purely civil statutory requirements to constitute illegal activity. PSLF Rule, 90 Fed. Reg. at 48,980 (emphasis added). Organizations such as Plaintiffs thus face the risk, for example, that posting "no human is illegal" on social media could be taken by the Department to constitute encouraging removable aliens to remain in the United States in violation of civil (but not criminal) immigration law. The Rule provides no basis to definitely resolve whether such core political speech, at the heart of the First Amendment's protections, falls within the Rule's proscription of aiding and abetting violations of the immigration laws. That level of vagueness is incompatible with the Fifth Amendment's requirement of due process. And the Rule's vagueness directly and immediately harms Plaintiffs, who, because they cannot rely on established precedent to govern their conduct, may have to abandon or curtail programs that they are confident are lawful but that carry a risk of enforcement action by the Department. *See* Perez Decl. ¶ 16; Proaño Decl. ¶ 16; Louie Decl. ¶ 18; Lowere Decl. ¶¶ 10–12.

## V.    The PSLF Rule suppresses protected speech in violation of the First Amendment.

The First Amendment prohibits the government from punishing speech or expressive conduct "because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). "Content-based laws—those that target speech based on its communicative content— are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). "Government discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinions or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'" *Id.* at 168 (quoting *Rosenberger*

*v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). The First Amendment also prohibits the government from chilling protected speech through "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). Government action impermissibly chills speech when it "would be 'likely to deter a person of ordinary firmness from the exercise of First Amendment rights.'" *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 29 (D.D.C. 2024) (quoting *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021)).

The PSLF Rule impermissibly attempts to silence disfavored speech on immigration and workplace diversity by threatening to revoke PSLF eligibility for organizations that lawfully express viewpoints that the Department disfavors. Organizations like Plaintiffs that work, through their speech and expressive conduct, to provide assistance and support to immigrants, including aliens subject to removal, *see* Perez Decl. ¶¶ 7, 11; Proaño Decl. ¶¶ 2-6; Louie Decl. ¶ 6; Loweree Decl. ¶¶ 2–6, risk losing access to the PSLF program—and suffering the attendant harms to recruiting and retention—if the Department deems them to be "encouraging" or "enabling" violations of the immigration laws. And organizations like The Council, which maintains an internal DEI program, Loweree Decl. ¶ 12, as well as Plaintiffs KHRC and LULAC, which operate programs that promote diversity and empowerment for women and marginalized communities, Perez Decl. ¶¶ 5, 6; Proaño Decl. ¶ 14, likewise risk losing eligibility for PSLF if the Department deems their work to constitute encouraging or enabling violations of the administration's understanding of antidiscrimination law. Organizations espousing the opposite viewpoints face no risk of losing benefits.

In response to comments, *see, e.g.* ED_00157 (Comment of American Bar Association), the Department states that the Rule's inclusion of a provision specifying that nothing in the Rule

"shall be construed to authorize" a determination that "an employer has a substantial illegal purpose based upon the employer or its employees exercising their First Amendment rights," 34 C.F.R. § 685.219(h)(2), ensures that the Rule cannot violate the First Amendment. "Nonprofits and advocacy groups are free to pursue their missions without fear of interference," the Department claims, "provided their actions are lawful." PSLF Rule, 90 Fed. Reg. at 48971. Unfortunately, that assurance rings hollow in light of the Department's position that speech and expressive conduct that encourages or enables violations of the Department's understanding of civil immigration and antidiscrimination law constitutes "illegal activity." The Department's threat of enforcement against disfavored viewpoints objectively chills First Amendment protected activity.

## CONCLUSION

The Court should grant summary judgment to Plaintiffs, declare the PSLF Rule arbitrary, capricious, not in accordance with law, in excess of statutory authority, and contrary to constitutional right and vacate the PSLF Rule.


Dated: February 9, 2026                    Respectfully submitted,

                                           /s/ Cormac A. Early
                                           Cormac A. Early (DC Bar No. 1033835)
                                           Adina H. Rosenbaum (DC Bar No. 490928)
                                           Adam R. Pulver (DC Bar No. 486293)
                                           Public Citizen Litigation Group
                                           1600 20th Street NW
                                           Washington, DC 20009
                                           (202) 588-1000

                                           Aaron S. Ament (DC Bar No. 1602164)
                                           Chris Bryant (DC Bar No. 1673495)
                                           Eric Rothschild (DC Bar No. 1048877)
                                           Daniel A. Zibel (DC Bar No. 491377)
                                           National Student Legal Defense Network

1701 Rhode Island Ave. NW
Washington, D.C. 20036
(202) 734-7495

*Attorneys for Plaintiffs*