## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ROBERT F. KENNEDY CENTER FOR JUSTICE AND HUMAN RIGHTS, *et al.*, <br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION, *et al.*, <br><br> *Defendants*. | Case No. 25-3860-AHA |

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, AND OPPOSITION TO DEFENDANTS' CROSS-MOTION TO DISMISS

Aaron S. Ament (DC Bar No. 1602164)
Chris Bryant (DC Bar No. 1673495)
Eric Rothschild (DC Bar No. 1048877)
Daniel A. Zibel (DC Bar No. 491377)
National Student Legal Defense Network
1701 Rhode Island Avenue NW
Washington, DC 20036
(202) 734-7495

Cormac A. Early (DC Bar No. 1033835)
Adina H. Rosenbaum (DC Bar No. 490928)
Adam R. Pulver (DC Bar No. 1020475)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Attorneys for Plaintiffs*

March ---, 2026

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

ARGUMENT .................................................................................................................................... 2

    I.    Plaintiffs have standing to challenge the PSLF Rule and their challenge is ripe ............. 2

    II.  The PSLF Rule is contrary to law and exceeds the Department's statutory authority..... 10

    III. The PSLF Rule is arbitrary and capricious. .................................................................... 15

          A.  The Rule has no rational connection to the factual record.................................... 15

          B.  The Rule is illogical on its own terms.................................................................. 17

    IV. The PSLF Rule is impermissibly vague in violation of the Due Process Clause ............ 20

    V.  The Rule suppresses protected speech in violation of the First Amendment .................. 23

    VI. The appropriate remedy is vacatur of the Rule.................................................................. 24

CONCLUSION................................................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Laboratories v. Garner,*
  387 U.S. 136 (1967) ................................................................................................. 8

*American Petroleum Institute v. EPA,*
  683 F.3d 382 (D.C. Cir. 2012)................................................................................. 8, 9

*Arizona v. United States,*
  567 U.S. 387 (2012) ................................................................................................. 19

*Babbit v. Farm Workers,*
  442 U.S. 289 (1979) ................................................................................................. 6

*Board of Regents of State Colleges v. Roth,*
  408 U.S. 564 (1972) ................................................................................................. 22

*Bloche v. Department of Defense,*
  414 F. Supp. 3d 6 (D.D.C. 2019)............................................................................. 18

*Bob Jones University v. United States,*
  461 U.S. 574 (1983) ................................................................................................. 14

*Cabrera v. U.S. Department of Labor,*
  792 F. Supp. 3d 91 (D.D.C.  2025)........................................................................... 24

*Clapper v. Amnesty International USA,*
  568 U.S. 398 (2013) ................................................................................................. 3, 4

*Colorado River Indian Tribes v. National Indian Gaming Commission,*
  466 F.3d 134 (D.C. Cir. 2006).................................................................................. 11

*Elevance Health, Inc. v. Becerra,*
  736 F. Supp. 3d 1 (D.D.C. 2024).............................................................................. 19

*Entergy Services, Inc. v. FERC,*
  375 F.3d 1204 (D.C. Cir. 2004)................................................................................ 19

*FCC v. Fox Television Stations,*
  567 U.S. 239 (2012) ................................................................................................. 22

*FDA v. Alliance for Hippocratic Medicine,*
  602 U.S. 367 (2024) ................................................................................................. 2, 3

ii

*Harmon v. Thornburgh*,
    878 F.2d 484 (D.C. Cir. 1989)............................................................................ 24

*Home Box Office, Inc. v. FCC*,
    567 F.2d 9 (D.C. Cir. 1977)............................................................................... 15

*Industrial Energy Consumers of America v. FERC*,
    125 F.4th 1156 (D.C. Cir. 2025)......................................................................... 9

*Lorillard v. Pons*,
    434 U.S. 575 (1978) .......................................................................................... 19

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .......................................................................................... 2

*Make the Road New York v. Noem*,
    No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025)............................ 24

*MCI Telecommunications Corp. v. AT&T*,
    512 U.S. 218 (1994) .......................................................................................... 11

*Mercy Hospital v. Azar*,
    891 F.3d 1062 (D.C. Cir. 2018).......................................................................... 12

*Mingo Logan Coal Co. v. EPA*,
    829 F.3d 710 (D.C. Cir. 2016)............................................................................ 15

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) .......................................................................................... 3

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) .......................................................................................... 20

*Motor Vehicle Manufacturers Ass'n of the U.S. v. State Farm Mutual Auto Insurance Co.*,
    463 U.S. 29 (1983) ...................................................................................... 15, 17

*National Ass'n of Broadcasters v. FCC*,
    39 F.4th 817 (D.C. Cir. 2022)............................................................................ 11

*National Ass'n of Diversity Officers in Higher Education v. Trump*,
    167 F.4th 86 (4th Cir. 2026)............................................................................... 3

*National Mining Ass'n v. U.S. Army Corps of Engineers*,
    145 F.3d 1399 (D.C. Cir. 1998).......................................................................... 24

*NetworkIP, LLC v. FCC,*
   548 F.3d 116 (D.C. Cir. 2008)...................................................................................... 18

*New York Stock Exchange LLC v. SEC,*
   962 F.3d 541 (D.C. Cir. 2020)...................................................................................... 11

*Parker v. District of Columbia,*
   478 F.3d 370 (D.C. Cir. 2007)........................................................................................ 5

*Secular Student Alliance v. U.S. Department of Education,*
   762 F. Supp. 3d 24 (D.D.C. 2025)................................................................................ 11

*Seegars v. Gonzalez,*
   396 F.3d 1248 (D.C. Cir. 2005).................................................................................. 5, 6

*State National Bank of Big Spring v. Lew,*
   795 F.3d 48 (D.C. Cir. 2015).......................................................................................... 2

*Stolt-Nielsen S.A. v. AnimalFeeds International Corp.,*
   559 U.S. 662 (2010) ....................................................................................................... 9

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) .................................................................................................... 6, 9

*Trump v. CASA,*
   606 U.S. 831 (2025) ...................................................................................................... 24

*Trump v. New York,*
   592 U.S. 125 (2020) ........................................................................................................ 8

*Virginia v. American Booksellers Ass'n,*
   484 U.S. 383 ................................................................................................................... 6

*Warth v. Seldin,*
   422 U.S. 490 (1975) ........................................................................................................ 5

*Western Minnesota Municipal Power Agency v. FERC,*
   806 F.3d 588 (D.C. Cir. 2015).................................................................................. 13, 14

**Statutes**

5 U.S.C. § 706(2)(B)............................................................................................................. 20

8 U.S.C. § 1105 .................................................................................................................... 18

8 U.S.C. § 1325.................................................................................................................... 18

18 U.S.C. §§ 2239A, 2339B ................................................................................... 21

20 U.S.C. § 1087e(m)(1) ....................................................................................... 10

20 U.S.C. § 1087e(m)(3)(B) ........................................................................ 10, 12, 22

20 U.S.C. § 1221e-3 .......................................................................................... 10–11

29 U.S.C. § 621 .................................................................................................... 19

42 U.S.C. § 1981 .................................................................................................. 19

42 U.S.C. § 12101 ................................................................................................ 19

**Regulations**

34 C.F.R. § 685.219(b)(4) ...................................................................................... 8

34 C.F.R. § 685.219(b)(12) .................................................................................... 19

34 C.F.R. § 685.219(b)(17) .................................................................................... 18

34 C.F.R. § 685.219(b)(30)(i) ................................................................................ 18

34 C.F.R. § 685.219(b)(30)(v) ............................................................................... 18

34 C.F.R. § 685.219(b)(30)(vi) .............................................................................. 22

34 C.F.R. § 685.219(b)(34) ............................................................................... 16, 22

34 C.F.R. § 685.219(g)(7) ...................................................................................... 22

34 C.F.R. § 685.219(h) .......................................................................................... 21

34 C.F.R. § 685.219(i)(1)(i) ............................................................................. 2, 3, 4

34 C.F.R. § 685.219(i)(1)(ii) .................................................................................... 3

34 C.F.R. § 685.219(h) ............................................................................................ 2

PSLF Rule,
   90 Fed. Reg. 48966 (Oct. 31, 2025) ................ 3, 4, 6, 7, 8, 13, 14, 15, 16, 17, 19, 20, 21, 22, 23

**Other Authorities**

Executive Order 14151, 90 Fed. Reg. 8339 (Jan. 21, 2025)............................................................ 7

Executive Order 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025)............................................................ 8

Executive Order 14235, 90 Fed. Reg. 11885 (Mar. 7, 2025) ...................................................... 6, 8

Presidential Memorandum, Preventing Abuses of the Legal System and the Federal Court (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court/.................................................................................. 7

**INTRODUCTION**

The Public Service Loan Forgiveness (PSLF) statute guarantees loan forgiveness to borrowers who make necessary payments and work in a "public service job," including any full-time job at a 501(c)(3) nonprofit organization. But starting July 1, the Department of Education's new PSLF Rule will erase that guarantee, subjecting borrowers and their public-service employers to a standardless enforcement regime that empowers the Secretary of Education to punish individuals and organizations that this administration disfavors.

Plaintiffs are four law-abiding 501(c)(3) organizations that participate in the PSLF program. Because of their work on immigration, diversity, equity, and inclusion (DEI), and gender-affirming care, they risk being unjustly excluded from the PSLF program under the Rule. The Rule is manifestly contrary to the statutory text, which unambiguously provides that *all* full-time jobs at a 501(c)(3) organization qualify for PSLF, leaving no room for the Secretary to exclude those employers for any reason. In arguing otherwise, Defendants rely only on the Secretary's general rulemaking authority and concerns about trivial textual surplusage, but those arguments do not justify the Rule's stark departure from the plain language of the law.

On Plaintiffs' other arguments, Defendants present a version of the Rule that bears little resemblance to the regulatory text. In Defendants' telling, the Rule does little more than recapitulate state and federal laws that already govern Plaintiffs' conduct. If Plaintiffs follow the law, Defendants argue, they have nothing to fear from the Rule and so suffer no injury giving rise to standing. Defendants assert that the Rule cannot violate Plaintiffs' constitutional due process and free speech rights if Plaintiffs do not challenge the underlying state and federal laws referenced in the Rule. These arguments are irreconcilable with the text of the Rule. The Rule grants the Secretary unfettered discretion to bring enforcement actions for conduct that the Secretary, in her absolute discretion, deems "illegal," even if no court has ever held such conduct to violate the law,

1

and its list of "illegal activities" is inexplicable except as a reflection of political animus. The Rule also creates a novel category of accessory liability for violations of civil laws using criminal-law aiding-and-abetting standards, thus subjecting wholly legal conduct to administrative punishment. Defendants do not even attempt to defend this unprecedented legal experiment, instead arguing that the Rule's accessory liability applies only to criminal acts. That argument would avoid some, though not all, of the problems identified in Plaintiffs' opening brief, but it does not describe the Rule that Defendants actually wrote.

This Court should grant summary judgment to Plaintiffs, declare the Rule unlawful, and vacate it.

## ARGUMENT

**I.    Plaintiffs have standing to challenge the PSLF Rule and their challenge is ripe.**

**A.** As Plaintiffs' opening brief explained, "'there is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992)). That is because "[g]overnment regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements" of the standing inquiry. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024). In such cases, "standing is usually easy to establish." *Id.*

As 501(c)(3) employers that participate in the PSLF program, Plaintiffs are directly regulated by the PSLF Rule, which requires them to "certify that [they] did not participate in activities with a substantial illegal purpose," on pain of losing their status as a qualifying employer. 34 C.F.R. §§ 685.219(i)(1)(i), (h). The Rule also empowers the Secretary of Education, acting on her own initiative, to strip employers like Plaintiffs of eligibility to participate in PSLF by

2

determining that they "engaged in activities such that [they have] a substantial illegal purpose." *Id.* § 685.219(i)(1)(ii).

As the direct objects of the Rule, Plaintiffs satisfy the requirements of standing in at least three ways. First, the Rule "require[s] … some action by the[m]," *Alliance*, 602 U.S. at 382, because it affirmatively requires them to certify compliance with the Rule's substantive standards. 34 C.F.R. § 685.219(i)(1)(i). Plaintiffs are injured by having to take action they would not otherwise take; the Rule is the direct cause of that injury; and vacating the Rule would eliminate the injury. That is all that standing requires. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 167 F.4th 86, 106 (4th Cir. 2026) (Rushing, J., concurring in part and concurring in the judgment) (finding standing where "Plaintiffs have plausibly alleged that the Certification Provision will one day require them to certify, an action they otherwise would not take."). Defendants do not address that injury in their brief.

Second, Defendants are already incurring or imminently will incur substantial costs to prepare for compliance with the Rule. *See* Loweree Decl. ¶¶ 8, 13, ECF 17-4 at 3, 4; Proaño Decl. ¶ 18, ECF 17-5 at 4; Perez Decl. ¶¶ 14–15, ECF 17-3 at 5; Louie Decl. ¶¶ 16–17, ECF 17-6 at 4–5. Costs that a plaintiff "reasonably incurs to mitigate or avoid" a "'substantial risk' that harm will occur" give rise to standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153–54 (2010)). Defendants do not dispute that Plaintiffs are reasonably incurring costs to comply with the Rule. Nor could they: The Rule itself recognizes that employers will face "[c]ompliance costs," including for "legal counsel, restructuring efforts, and changes to the organization's documentation processes." 90 Fed. Reg. at 48933. And the harm that Plaintiffs seek to avoid by incurring compliance costs is not merely substantially likely, but rather certain to occur if they do not make adequate preparations to certify

3

their compliance with the Rule: Any organization that cannot certify compliance will automatically be excluded from the PSLF program. 34 C.F.R. § 685.219(i)(1)(i). Defendants likewise do not dispute that such exclusion would harm Plaintiffs.

Defendants respond that the harm of incurring compliance costs "result from [Plaintiffs'] own 'compliance preparations ahead of the Rule's July 1, 2026, effective date,'" and are therefore "neither reasonable nor traceable to any action by the Department." ECF 31 at 16 (quoting ECF 18 at 24)). That is a non sequitur: *All* costs reasonably incurred to avoid a substantial risk of harm result, in the first instance, from a plaintiff's own decision to incur those costs. Such costs are nevertheless sufficient for standing to challenge agency action when it is reasonable to incur costs to avoid harm that agency action would otherwise cause to the plaintiff. *See Clapper*, 568 U.S. at 414 n.5. That is the case here, where it is undisputed that exclusion from PSLF would harm Plaintiffs, that Plaintiffs must certify compliance with the Rule to avoid exclusion, and that it is reasonable to incur compliance costs to permit certification and thereby avoid exclusion.

Defendants also suggest that the costs of compliance are attributable to the need for "compliance with Federal and State laws," rather than with the PSLF Rule. ECF 31 at 16. That argument is untenable even on its own terms. As the preamble to the Rule implicitly concedes when discussing its impact, taking the steps necessary to affirmatively certify compliance with federal and state law—including consulting with "legal counsel" and making "changes to the organization's documentation processes"—is more costly than merely complying with the law without the need to certify. 90 Fed. Reg. at 48993; *see also id.* (suggesting that the Rule may impose only *de minimis* additional compliance costs on "organizations [that] are accustomed to attesting to the fact that they are not violating Federal and State law."). Plaintiffs' compliance costs

would thus be sufficient to support standing even if the underlying substantive legal obligations flowed exclusively from other state and federal laws.

In any event, Defendants' premise is wrong. As explained below, *see* pp. 18–20, the Rule penalizes "aiding and abetting" violations of civil laws in a way that no other law does, and thus imposes substantial and poorly defined new substantive obligations on Plaintiffs. The costs of complying with those obligations injure Plaintiffs and arise solely from the Rule. And for purposes of standing, "a federal court must assume, *arguendo*, the merits of [a plaintiff's] legal claim." *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) (citing *Warth v. Seldin*, 422 U.S. 490, 501–02 (1975)). The Court must thus accept, when considering standing, Plaintiffs' contention that the Rule constitutes an unprecedented application of criminal-law accessory liability concepts to purely civil immigration and antidiscrimination contexts, Compl. ¶¶ 5, 32, 42–43, 60, ECF 1 at 3, 12, 14–15, 18, thereby penalizing conduct that is not otherwise illegal, ECF 18 at 33–36. The costs of complying with that requirement must also thus be chalked up solely to the Rule, rather than any other federal or state law.

Third, Plaintiffs have standing based on the risk that the Rule will be enforced against them. Citing *Seegars v. Gonzalez*, 396 F.3d 1248 (D.C. Cir. 2005), Defendants argue that Plaintiffs have not shown that they "have been personally threatened with prosecution" or that enforcement against them "has any special priority for the government." ECF 31 at 15 (quoting *Seegars*, 396 F.3d at 1255 (cleaned up)). But *Seegars* acknowledged that the standard applied in that case and invoked by Defendants here "is in sharp tension with standard rules governing preenforcement challenges to agency regulations," and limited that standard's application only to "preenforcement challenges to a criminal statute not burdening expressive rights and not in the form of appeal from an agency decision." *Seegars*, 396 F.3d at 1253. In contrast, in a case such as this one involving a

5

challenge to an agency regulation, "an affected party may generally secure review before enforcement so long as the issues are fit for judicial review without further factual development and denial of immediate review would inflict a hardship on the challenger—typically in the form of its being forced either to expend non-recoverable resources in complying with a potentially invalid regulation or to risk subjection to costly enforcement processes." *Id.* The threat of enforcement need only be more than "imaginary or wholly speculative." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160, 165 (2014) (quoting *Babbit v. Farm Workers*, 442 U.S. 289, 302 (1979)); *see also Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise.").

Here, the threat of enforcement against Plaintiffs is far more than "imaginary or wholly speculative." *Susan B. Anthony List*, 573 U.S. at 160. The Rule is the Department's direct response to President Trump's Executive Order decrying "activist organizations that not only fail to serve the public interest, but actually harm our national security and American values." Executive Order 14235, 90 Fed. Reg. 11885 (Mar. 7, 2025). And the Rule makes clear that the President, through that Executive Order, has already "determined how he would like the Department to exercise [its] prosecutorial discretion in taking enforcement actions where organizations are engaged in illegal conduct" through the selection of activities triggering exclusion from PSLF. 90 Fed. Reg. at 49976. Plaintiffs, whose work touches several of the Department's enforcement priorities as expressed in the Rule, including assistance to immigrants, promotion of Diversity, Equity, and Inclusion (DEI), and provision of gender-affirming care, reasonably fear that the Rule will be enforced against them.

Those fears are particularly acute because the Rule's application is not bound by any pre-existing or independent understanding of the relevant laws. The relevant question with respect to

6

the risk of enforcement is thus not what the courts have said about the law, but instead what the Trump administration has said. And this administration's views are alarmingly out of step with any judicial consensus in exactly the areas that the Rule singles out as enforcement priorities. For example, although the Rule claims that "ordinary, lawful assistance such as legal advice" will not trigger enforcement, 90 Fed. Reg. at 48980, the President has, without foundation, accused "the immigration bar" of "frequently coach[ing] clients to conceal their past or lie about their circumstances when asserting their asylum claims" in an attempt to "deceive the immigration authorities and courts into granting them undeserved relief," and he has directed the Attorney General to pursue disciplinary action against attorneys opposing the government. Presidential Memorandum, Preventing Abuses of the Legal System and the Federal Court (Mar. 22, 2025).[1] Organizations like Plaintiffs, all of which provide legal representation in immigration litigation, have good reason to fear baseless accusations of fraud and arbitrary enforcement of the Rule. Likewise, the President has claimed that DEI policies are not only "illegal," but also "dangerous, demeaning, and immoral," as well as a "threat[] to the safety of American men, women, and children." Ending Illegal Discrimination and Restoring Merit-Based Opportunity, Exec. Order 14151, 90 Fed. Reg. 8339 (Jan. 21, 2025). All Plaintiffs have programs or activities that fall under the broad umbrella of DEI, and thus they all face a real threat of enforcement notwithstanding the legality of their activities. In addition, Plaintiff The Door risks enforcement under the Rule because it provides gender-affirming care to adults aged 18 and over, in accordance with New York law. The Rule claims that "[o]rganizations will not be penalized if their actions are legal in the State in which they are operating," 90 Fed. Reg. at 48988, and federal law does not prohibit the provision

---

[1] *Available at* https://www.whitehouse.gov/presidential-actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court/.

of gender-affirming care. But that assurance rings hollow given that the Rule defines 18-year-olds as children, *see* 34 C.F.R. § 685.219(b)(4), and that the President, as part of an Executive Order titled "Protecting Children from Chemical and Surgical Mutilation," has suggested that gender-affirming care (including care that is lawful under state law) violates the federal criminal prohibition on female genital mutilation. Exec. Order 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025). In fact, the Executive Order that directed the Secretary of Education to craft this Rule characterized gender-affirming care for children—regardless of whether it violated federal or state law—as "child abuse," which it identified as an activity having "a substantial illegal purpose." Exec. Order 14235, 90 Fed. Reg. 11885 (Mar. 7, 2025). All Plaintiffs thus face a threat of enforcement under the Rule that is far more than merely speculative and that creates injury sufficient for standing.

**B.** Defendants repeat many of their standing arguments under the heading of ripeness. Ripeness, like standing, is a "doctrine[] of justiciability … originating in the case-or-controversy requirement of Article III." *Trump v. New York*, 592 U.S. 125, 131 (2020). The constitutional aspect of ripeness doctrine, however, "is subsumed into the Article III requirement of standing," *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012), and to the extent Defendants invoke constitutional ripeness, their arguments fail for the reasons discussed above.

Courts have also recognized a non-constitutional "prudential" aspect of ripeness. *Id.* at 387. That doctrine focuses on "'the fitness of the issues for judicial decision' and the extent to which withholding a decision will cause hardship to the parties." *Id.* (quoting *Abbott Labs. v. Garner*, 387 U.S. 136, 149 (1967)). As an initial matter, the Supreme Court has questioned the "continuing vitality of the prudential ripeness doctrine," in light of federal courts' "virtually unflagging" obligation to "hear and decide cases within [their] jurisdiction." *Susan B. Anthony List*, 573 U.S. at 167 (citation and internal quotation marks omitted); *see also Indus. Energy Consumers of Am.*

8

*v. FERC*, 125 F.4th 1156, 1163 (D.C. Cir. 2025) (Henderson, J., concurring) ("Insofar as ripeness rests on prudential considerations, it infringes on our constitutional duty to adjudicate a proper case or controversy.").

To the extent the doctrine lives, prudential ripeness poses no barrier to resolving this case on the merits. The "fitness" prong of prudential standing considers whether the issue presented is "purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Am. Petroleum Inst.*, 683 F.3d at 387 (internal citation and quotation marks omitted). That analysis decisively favors review now: The validity of the PSLF Rule is a legal issue and does not require consideration of any particular concrete applications of the Rule, and the Rule plainly constitutes final agency action.

The "hardship" prong of prudential ripeness likewise favors immediate review. Plaintiffs are already devoting scarce resources to prepare for compliance with the Rule and will be subject to the certification requirement on July 1. Withholding decision on the Rule's validity will cause immense hardship to Plaintiffs. In contrast, the timing of a merits decision is immaterial to Defendants, who will eventually have to defend the Rule based on the existing administrative record and existing law.

Moreover, prudential ripeness can be waived. *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010) ("To the extent the dissent believes that the question is prudentially unripe, we reject that argument as waived."). Because Defendants' ripeness argument addresses only the possibility of future enforcement of the PSLF Rule against Plaintiffs, *see* ECF 31 at 17–18, Defendants have waived any prudential ripeness argument against Plaintiffs' challenge to the "new obligations and compliance costs" imposed by the Rule, ECF 18 at 25. And because any of Plaintiffs' theories of injury would independently suffice to support the full range

9

of requested relief, there is no need for the Court to consider Defendants' prudential ripeness argument as to only one of those theories.

## II.    The PSLF Rule is contrary to law and exceeds the Department's statutory authority.

The text of the PSLF statute is clear: the Secretary of Education "shall" cancel the outstanding balance of eligible loans for borrowers who make the statutorily required payments and who are "employed in a public service job" at the time of loan forgiveness and while making the necessary payments. 20 U.S.C. § 1087e(m)(1). The statute goes on to clarify that "[t]he term 'public sector job' means," as relevant here, "a full-time job … at an organization that is described in section 501(c)(3) of Title 26 and exempt from taxation under section 501(a) of such title"—i.e. at a 501(c)(3) organization. *Id.* § 1087e(m)(3)(B). Putting those pieces together, the statute thus provides that the Secretary "shall" cancel the loans of qualifying borrowers who work at 501(c)(3) organizations. The statute does not impose any limitations on which 501(c)(3)s count, and it leaves no room for the Secretary to impose new limitations by regulation.

Defendants make two arguments in an attempt to overcome the plain text of the PSLF statute. First, they cite the Higher Education Act's provisions delegating rulemaking authority to the Secretary. Second, they point out the overlap among the 18 categories of employment that the statute includes within the definition of "public sector job," and suggest that treating all jobs within each of those categories as qualifying employment would create a problem of statutory surplusage. Neither argument is persuasive.

The Secretary's general rulemaking authority, to "make, promulgate, issue, rescind, and amend rules and regulations" subject to "limitations as may be otherwise imposed by law," 20 U.S.C. § 1221e-3, does not include a delegation of the power to rewrite the terms of the statute itself. *See Secular Student Alliance v. U.S. Dep't of Educ.*, 762 F. Supp. 3d 24, 31 (D.D.C. 2025) ("[B]ecause the secretary is 'subject to limitations as may be otherwise imposed by law,' the rule

10

must conform to any additional directions or limits imposed on the Secretary by Congress."). "An agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority." *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006). Instead, "[w]hen an agency acts pursuant to its rulemaking authority, a reviewing court determines whether the resulting regulation exceeds the agency's statutory authority or is arbitrary and capricious," and "does not simply assume that a rule is permissible because it was purportedly adopted pursuant to an agency's rulemaking authority." *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 546 (D.C. Cir. 2020). Agencies "are bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 n.4 (1994). An agency thus may not rely on "[a] generic grant of rulemaking authority" to "alter the specific choices Congress made." *Nat'l Ass'n of Broads. v. FCC*, 39 F.4th 817, 820 (D.C. Cir. 2022).

Altering Congress's specific choices about qualifying employment is precisely what the Rule attempts to do, and it therefore strays beyond the limits of the Secretary's regulatory authority. Congress required the Secretary to forgive the loans of borrowers who satisfy the other statutory criteria and who work at a 501(c)(3) organization; under the Rule, however, the Secretary has arrogated to herself the power to decline to forgive the loans of such borrowers if she determines that the borrower's employer does not sufficiently advance the public interest as she understands it. Congress could have chosen to delegate such authority to the Secretary, but it did not do so in the Higher Education Act's generic grant of rulemaking authority. And Defendants point to no other statutory source that could provide an alternative basis for the authority claimed in the Rule.

Likewise, the possibility of overlap between the categories of qualifying employment does not suggest that Congress intended to allow the Secretary to disqualify employment that undisputedly falls within one of the statutory categories. Defendants argue that the Rule ensures that "only professions that advance the public interest are included in the list of PSLF-eligible 'public service job[s]'" in the statute, and they claim that "[t]he overlap among the categories [in the statute] provides insight into the types of jobs Congress intended to designate as PSLF eligible." ECF 31 at 19. That argument turns the statute on its head. Congress did not make loan forgiveness available to "professions that advance the public interest" as defined by the Secretary, and provide categories of employment as hints of the kinds of jobs it intended to qualify; instead, Congress extended loan forgiveness to borrowers who work in "public service job[s]," and it defined that term to "mean[]" precisely the categories listed in the statute. 20 U.S.C. § 1087e(m)(3)(B).

The risk of statutory surplusage cannot justify Defendants' topsy-turvy reading of the statute. "Although choosing the reading that reduces redundancies is a helpful rule when interpreting ambiguous text, it does not apply when the text's meaning is plain." *Mercy Hosp. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018). "[R]edundancies that are subtle or pitted against otherwise plain meanings" provide only "feeble interpretive clues." *Id.* Defendants rely on just such minor redundancies, such as the "overlap between the public interest law services category and the Section 501(c)(3) category." ECF 31 at 19. Defendants do not explain how continuing to treat all "public interest law services" jobs and all jobs at 501(c)(3) organizations as qualifying employment makes it more difficult to administer the statute, or otherwise leads to any problem that Congress might have wished to avoid. Nor do they explain how the Rule, in practice, would reduce the overlap between the statutory categories—after all, except for an estimated ten

12

employers per year, 90 Fed. Reg. at 48971, the Department does not expect to exclude the vast majority of employment that qualified before the Rule from continuing eligibility after the Rule takes effect. A borrower working at a public interest legal provider organized as a 501(c)(3) will, with very rare exceptions, continue to be able to claim eligibility for loan forgiveness under either category. The possibility of redundancy is thus far too thin a reed to support the Rule's attempted rewriting of the statutory text.

As with the Federal Power Act provision at issue in *Western Minnesota Municipal Power Agency v. FERC*, 806 F.3d 588 (D.C. Cir. 2015), "nothing in the language" of the PSLF statute "qualifies or restricts" which members of the categories specified in the statutory text are entitled to receive the statutory benefit. *Id.* at 592. The use of the word "shall" thus indicates a "mandatory directive" to the agency to provide the statutory benefit to all members of the specified categories, rather than "an invitation for the [agency] to determine when" providing the statutory benefit "would serve the public interest as the [agency] sees it." *Id.* Defendants argue that the PSLF statute "does not include the type of mandatory language" at issue in that case, but they do not explain how the language of the two statutes is different in any relevant sense. The Federal Power Act provided a preference for applications from "States and municipalities," without qualification, *id.*; the PSLF statute provides for loan forgiveness for borrowers who work at 501(c)(3) organizations (or in any of the other types of employment specified in the statute), also without qualification.

Defendants argue that the Court's analysis in that case "focused on the statute's use of the term 'shall,'" whereas, Defendants argue, "the PSLF Final Rule does not speak to or attempt to regulate" the PSLF statute's use of the word "shall." ECF 31 at 20. That argument is mere hairsplitting. The statute provides that the Secretary "shall" forgive loans subject to specified conditions; by purporting to alter the meaning of the statutory conditions, Defendants have

13

effectively changed what it is that the Secretary "shall" do. *Western Minnesota* thus governs: The Secretary has a mandatory duty, arising from the combination of the term "shall" with unqualified eligibility language, to forgive loans from qualified borrowers who work at 501(c)(3) organizations, and may not limit eligibility based on her own assessment of the public interest.

Finally, Defendants have retreated from the Rule's invocation of the "illegality doctrine" as an independent source of authority to restrict PSLF eligibility. Whereas the Rule claimed that "under the illegality doctrine, courts and the IRS have established that revocation of statutory benefits to organizations engaged in illegal purposes is proper," 90 Fed. Reg. at 48971, Defendants now argue only that the Rule is "consistent with the way the government regulates in similar contexts," such as the IRS's application of the illegality doctrine, ECF 31 at 21. But even as reformulated, Defendants' invocation of the illegality doctrine provides no support for the Rule.

As Plaintiffs' opening brief explained, the illegality doctrine exists only in the context of the Internal Revenue Code, because the text of Section 501(c)(3) specifically incorporates background common-law principles governing charitable trusts. *See* ECF 18 at 28–29 (citing *Bob Jones Univ. v. United States*, 461 U.S. 574, 586, 588 (1983)). As a result, whether the Rule is "consistent with" the way the IRS administers the illegality doctrine could only be relevant to the Rule's legality if Defendants could demonstrate that the relevant text of the PSLF statute also incorporates background common-law principles governing charitable trusts. It does not matter whether the Rule implements "established legal standards" from the illegality doctrine, ECF 19 at 21 (quoting 90 Fed. Reg. at 48974), if there is no statutory basis to do so. And Defendants make no attempt to show the necessary statutory basis.

In short, the text of the PSLF statute resolves this case. All jobs at 501(c)(3) organizations, or at any other type of employer specified in the statute, qualify as "public service jobs," and

14

nothing in the Secretary's rulemaking authority, or the risk of statutory surplusage, or the illegality doctrine, allows the Secretary to impose additional limitations that do not appear in the statutory text.

### III.      The PSLF Rule is arbitrary and capricious.

As Plaintiffs' opening brief explained, the Rule is arbitrary and capricious because it has no basis in any facts in the record and is illogical on its own terms. Defendants' brief does not meaningfully challenge either argument.

#### A.      The Rule has no rational connection to the factual record.

To survive arbitrary-and-capricious review, an agency must articulate a "rational connection between the facts found and the choices made." *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 719 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). The first step in doing so is to establish that the problem the agency purports to address exists in the first place, since a "regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 36 (D.C. Cir. 1977).

The PSLF Rule fails at that first hurdle. According to Defendants, the Rule will address "challenges" that the PSLF program has had with "the disbursement of benefits to borrowers employed by organizations whose activities do not align with the program's public service objectives." 90 Fed. Reg. at 48933. But the rulemaking record is devoid of evidence that anyone employed at an organization with a "substantial illegal purpose" has ever benefited from PSLF. Nor do Defendants offer any factual basis for the Rule's projection of the number of organizations that will be stripped of PSLF eligibility each year.[2]

---

[2] The absence of any record evidence showing the existence of the problem the Rule purports to solve does not mean that Plaintiffs have nothing to fear if the Rule is allowed to take effect (nor

Rather than dispute the absence of any underlying factual record, Defendants offer a lengthy but nonresponsive description of the Rule's objectives and the procedures for implementing the Rule. *See* ECF 31 at 22–25. But because they do not first establish the existence and extent of the problem the Rule purports to solve—"the subsidization of employment at organizations that not only are failing to serve the public interest but are actually doing harm by engaging in illegal conduct," 90 Fed. Reg. at 48969—Defendants give the Court no basis to evaluate the adequacy of their decisionmaking, regardless of the level of deference that applies. Without even basic factual details about the alleged problem, there is no way to assess the choices Defendants made in crafting the Rule or to determine whether Defendants properly rejected alternative approaches. There is, for example, no factual record of the prevalence or severity of the six forms of illegal activity targeted by the Rule compared to other violations of the law that do not give rise to exclusion from PSLF under the Rule. And there is no factual basis to conclude that public interest employers are acting as accessories to widespread (or any) violations of civil immigration and antidiscrimination laws.

The closest Defendants come to identifying supporting factual material in the record is in citing a response to comments noting that "[t]he PSLF program has faced significant challenges over the years, including high denial rates, administrative barriers, and widespread confusion among borrowers." ECF 31 at 24 (quoting 90 Fed. Reg. at 48969). But even if the record

do Plaintiffs' standing arguments constitute an admission that Plaintiffs themselves are examples of the problem targeted by the Rule). Except as to violations of state laws regulating protests, *see* 34 C.F.R. § 685.219(b)(34), the Rule does not limit enforcement to cases that have been independently adjudicated by a neutral tribunal, but instead affords the Secretary essentially unfettered enforcement discretion, *see* 90 Fed. Reg. at 48987. Moreover, the Rule penalizes fully legal conduct by extending criminal accessory liability principles to civil violations of immigration and antidiscrimination laws. Thus, although Plaintiffs' programs and activities are lawful, Plaintiffs are nevertheless justified in fearing punishment under the Rule.

16

establishes that the PSLF program has faced various administrative challenges, the Rule does nothing to address those problems. Instead, it targets a distinct, and wholly unsubstantiated, problem of "subsidization of employment" at organizations that are "engaging in illegal activities." 90 Fed. Reg. at 48969.

Absent any facts in the record to support the Rule, Defendants rely on the generally deferential standard of review for arbitrary-and-capricious claims. But even Defendants' presentation of the relevant standards sets the bar too high for the Rule to pass. As Defendants acknowledge, an agency must articulate "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (citation omitted). Having failed to find any facts, Defendants cannot satisfy that standard. Defendants state that "the available data [often] do[es] not settle a regulatory issue[,] and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion." *Id.* at 52. Without *any* predicate "facts and probabilities" in the record, there is no basis on which the agency can exercise its judgment. There is a world of difference between an imperfect factual record and no record whatsoever.

### B.       The Rule is illogical on its own terms.

Plaintiffs explained in their opening brief that the Rule is illogical even when taken on its own terms because it attempts to penalize illegal activities by punishing conduct that is not illegal, and does so in a way that renders the Rule's guidance unintelligible. Plaintiffs further explained that the Rule's selection of targeted activities is illogical.

Defendants do not address Plaintiffs' argument about the Rule's selection of targeted activities and, therefore, have waived any argument that the Rule is not arbitrary and capricious on that basis. *See NetworkIP, LLC v. FCC*, 548 F.3d 116, 128 n.10 (D.C. Cir. 2008) (stating that arguments not raised in the opening brief are waived); *see also Bloche v. Dep't of Def.*, 414 F. Supp. 3d 6, 23 n.5 (D.D.C. 2019) (stating that the principle that issues not raised until the reply

17

brief are waived "holds when a party does not argue a point until its reply brief, even if the party referred to the argument in its opening brief").

Defendants do briefly address the Rule's penalization of otherwise legal conduct through the imposition of criminal-law accessory liability concepts to civil violations of immigration and antidiscrimination laws. But their response bolsters *Plaintiffs'* argument. Defendants do not dispute that it would be arbitrary and capricious for the Rule to have applied aiding-and-abetting liability to purely civil legal violations (and thus waive any argument to the contrary). Instead, they argue that the Rule "does not in any way apply the criminal aiding and abetting standard to civil violations." ECF 31 at 26.

Defendants' argument is irreconcilable with the text of the Rule. On Defendants' reading, the prohibition on "aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws," 34 C.F.R. § 685.219(b)(30)(i), would apply only to aiding and abetting criminal violations of immigration law, not to purely civil violations. Likewise, the prohibition on "[e]ngaging in a pattern of aiding and abetting illegal discrimination," *id.* § 685.219(b)(30)(v), would apply only to criminal, rather than civil, illegal discrimination. But the text of the Rule says otherwise. The Rule defines "Other Federal Immigration laws" to "mean any violation of the Immigration and Nationality Act (8 U.S.C. 1105 *et seq.*) or any other Federal immigration laws." *Id.* § 685.219(b)(17). That phrase "is broad[]" and "applies to Federal law that regulates immigration." 90 Fed. Reg. at 48982. The Rule also defines "[i]llegal discrimination" broadly to mean "a violation of any Federal discrimination law including, but not limited to, the Civil Rights Act of 1964 (42 U.S.C. 1981 *et seq.*), Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*), and the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 *et seq.*)." 34 C.F.R. § 685.219(b)(12). As Plaintiffs' opening brief established, and as Defendants do not dispute,

18

federal immigration and antidiscrimination law each contain purely civil prohibitions that do not subject the violator to criminal prosecution. ECF 18 at 33–34. For example, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona v. United States*, 567 U.S. 387, 407 (2012). Likewise, "Congress expressly declined to incorporate … criminal penalties" into the Age Discrimination in Employment Act (except for in Section 10 of the Act). *Lorillard v. Pons*, 434 U.S. 575, 582 (1978). The text of the Rule applies to "aiding and abetting" *all* violations of federal immigration and antidiscrimination law, and thus includes purely civil as well as criminal violations. As Plaintiffs argued, the Rule applies accessory liability to purely civil violations, and as Defendants do not dispute, that is arbitrary and capricious.

Pointing to a pair of statements in the preamble, Defendants claim that the Rule's accessory liability provisions are limited to criminal violations. Even if those portions of the preamble could be read that broadly, however, "it is axiomatic that 'language in the preamble of a regulation is not controlling over the language of the regulation itself.'" *Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 23 (D.D.C. 2024) (quoting *Entergy Servs., Inc. v. FERC*, 375 F.3d 1204, 1209 (D.C. Cir. 2004)). The preamble's statement that "[o]rganizations that do not aid or abet in criminal activity will not be disqualified from participating in the PSLF program," 90 Fed. Reg. at 48974, is incompatible with the text of the regulation itself, which covers aiding and abetting civil as well as criminal violations. In fact, that preamble statement underscores the Department's failure to realize that the Rule applies criminal accessory liability concepts to purely civil legal violations, let alone consider how such a novel form of liability would operate. The other statement to which Defendants cite can be read to describe the pre-existing law of aiding and abetting. *See* PLSF Rule, 90 Fed. Reg. at 48980 ("The concept of aiding and abetting is purposefully broad as it prohibits assisting in numerous types of criminal activity, but it is well understood by courts and the

19

public."). But to the extent that it disclaims application of accessory liability to purely civil violations, it is likewise incompatible with the regulatory text.

## IV.    The PSLF Rule is impermissibly vague in violation of the Due Process Clause.

As Plaintiffs' opening brief explained, the Rule is so vague, both procedurally and substantively, that arbitrary and discriminatory enforcement is all but inevitable. The Rule is therefore incompatible with the Fifth Amendment's guarantee of due process.

Before addressing the substance of Plaintiffs' arguments, Defendants briefly suggest that Plaintiffs' constitutional arguments have been raised "outside the APA context" and thus lack a cause of action. ECF 31 at 26. The Complaint, though, expressly requests declaratory and injunctive relief against the Rule under 5 U.S.C. § 706(2)(B) on the ground that it is "contrary to constitutional right, power, privilege, or immunity." ECF 1 at 26. Defendants do not suggest that claim was not properly pleaded or is not properly before this Court.

Defendants also note that Plaintiffs present a facial challenge to the Rule, which requires showing that "no set of circumstances exists under which the law would be valid," or "that the law lacks a plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 717 (2024). Defendants argue that Plaintiffs cannot satisfy this burden, because they "have failed to show how the PSLF Final Rule's exclusion of organizations that support foreign terrorist organizations or engage in interstate trafficking of children in any way violates the Constitution." ECF 31 at 26–27. Defendants misapprehend Plaintiffs' argument. Plaintiffs argue not only that the substantive provisions of the Rule, particularly those relating to aiding and abetting violations of federal immigration and antidiscrimination law, are impermissibly vague, but also that the Rule's processes are so vague and undefined that they vest the Department with arbitrary enforcement power. *See* ECF 18 at 40–41. Thus, even if, for example, the Rule's prohibition on "[s]upporting terrorism" posed no vagueness problems (despite the regulatory text's unexplained deviation from

20

the "material support" language of the relevant criminal laws, 18 U.S.C. §§ 2239A, 2339B), the road from a violation of that provision to an ultimate decision excluding an organization from PSLF is so amorphous as to be unconstitutionally vague. The finding of a violation of one of the Rule's prohibitions, by itself, offers a regulated organization practically no basis to know what to expect next. The Department will consider "the materiality of any illegal activities or actions," 34 C.F.R. § 685.219(h), including the "frequency" and "seriousness" of the activities, 90 Fed. Reg. at 48988. The Department suggests that "very serious" conduct, "such as acts of terrorism" "may" (or perhaps may not) be immediately disqualifying even without a pattern of behavior. 90 Fed. Reg. at 48988. But the Rule prohibits both "funding" and directly "engaging in violence" under the heading of "supporting terrorism," and it is unclear, for example, whether the Department would consider *de minimis* monetary support to be less serious than terrorist violence, or whether any activity under the heading of terrorism would be automatically disqualifying. Because the Rule does not say, all such decisions will be left to the Department's discretion. The Department likewise has not said whether or in what circumstances any other violations of the Rule's prohibitions could be considered "very serious." Moreover, the Department has rejected reliance on independent "judicial or administrative rulings" to establish violations of the Rule. 90 Fed. Reg. at 48987. Even the prohibition on violating state laws regulating protests, which requires a final state-court judgment to establish the predicate state-law violations, leaves it up to the Department to decide whether those violations constitute a "pattern." 34 C.F.R. § 685.219(b)(30)(vi), (b)(34). Regulated entities thus cannot rely on judicial precedent or established law to assess their risk of punishment under the Rule; the only legal opinion that matters is the Secretary's. In short, the Rule's procedures are so lacking in "precision and guidance" that "those enforcing the law" cannot

21

avoid acting in an "arbitrary or discriminatory way" when applying any of the Rule's provisions. *FCC v. Fox Television Stations*, 567 U.S. 239, 253 (2012).

As a final threshold matter, Defendants dispute that Plaintiffs have a "protected property interest" in participation in the PSLF program sufficient to trigger the Due Process Clause's protections. ECF 31 at 28. That argument is surprising, in light of the Rule's recognition that "the Department must provide a process that is consistent with the requirements of the Due Process Clause of the Fifth Amendment to the U.S. Constitution because of the property interests involved in the PSLF program." 90 Fed. Reg. at 48987. The Rule expressly prohibits borrowers from participating in the exclusion determination process, *see* 34 C.F.R. § 685.219(g)(7), so the "property interests involved in the PSLF program" that the Rule references can only be the interests of the employers. And the Rule's acknowledgement of these interests is correct. A plaintiff may claim the procedural protections of the Fifth Amendment against exclusion from a statutory benefit—even if he does not ultimately satisfy the eligibility conditions for that benefit—if he has "more than an abstract need or desire for it," or a "unilateral expectation of it," but rather "a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). The PSLF statute entitles all 501(c)(3) organizations, without qualification, to participate in the program. 20 U.S.C. § 1087e(m)(3)(B). The Secretary may not negate that entitlement without providing due process.

Advancing to the substance of Plaintiffs' due process claims, Defendants have little to add. On the substantive vagueness of the Rule's application of accessory liability to civil immigration and antidiscrimination violations, Defendants again deny that the problem exists, arguing that "the PSLF Final Rule does not target any conduct that is not already illegal under Federal and State laws." ECF 31 at 29. But they make no argument that the Rule can survive a vagueness challenge

22

if Plaintiffs' reading is correct. There is no existing body of law that regulated entities can look to in assessing their risk of liability for accessory conduct that is not illegal except for under the Rule, and no way to know in advance when conduct crosses the line from unpunished "assistance" to prohibited "enabling" and "encouraging" violations of civil immigration and antidiscrimination laws.

On the vagueness of the Rule's procedures, Defendants do not address any of the problems raised in Plaintiffs' opening brief. Instead, they point to the promise of an "unbiased adjudicator," and repeat the—hopelessly vague—standards that that adjudicator will need to apply, such as "look[ing] to see if there is a pattern of behavior by the organization, the gravity of the violation, and generally exclud[ing] evidence of technical violations of the law." ECF 31 at 29 (quoting 90 Fed. Reg. at 48970–71). Providing an unbiased adjudicator does not satisfy the requirements of due process when the Department has given that adjudicator so little substantive and procedural guidance that arbitrary enforcement is unavoidable.

## V.     The Rule suppresses protected speech in violation of the First Amendment.

Plaintiffs' opening brief demonstrated that the Rule impermissibly chills protected speech on immigration and workplace diversity because organizations like Plaintiffs that espouse positions opposed to those of this administration risk losing access to the PSLF program, whereas those that support the administration face no such risk.

Defendants' only response is to repeat the argument that the Rule only penalizes activities that are already illegal, thus imposing no additional burden on Plaintiffs' speech beyond the restrictions of pre-existing state and federal law. *See* ECF 31 at 31 ("[The Rule] simply restricts [Plaintiffs'] ability to engage in illegal activities while also maintaining PSLF benefits—activities that would be illegal even without those benefits."). Once again, Defendants do not attempt to defend the Rule as written, and they make no argument that imposing liability under the Rule for

23

conduct that is *not* otherwise proscribed by state and federal law is consistent with the First Amendment.

**VI.    The appropriate remedy is vacatur of the Rule.**

It is well-established in this Circuit that where a court finds agency action unlawful, the "ordinary result" is vacatur of that action. *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see also Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) (invoking the "[t]raditional administrative law principle" that "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated— not that their application to the individual petitioners is proscribed"). "[T]he scope of relief under the APA is not party-restricted." *Cabrera v. U.S. Dep't of Labor*, 792 F. Supp. 3d 91, 105 (D.D.C. 2025).

Although Defendants suggest that *Trump v. CASA*, 606 U.S. 831 (2025), changes the analysis, that opinion expressly declined to address the scope of vacatur under the APA. *Id.* at 847 n.10; *see Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *34 (D.C. Cir. Nov. 22, 2025) (statement of Millett, J., and Childs, J.) ("*CASA* is not a case about the scope of relief for agency review authorized by the APA."). Vacatur remains the standard remedy for unlawful agency action in this Circuit. The Court should thus vacate the PSLF Rule in its entirety.

**CONCLUSION**

The Court should grant summary judgment to Plaintiffs, declare the PSLF Rule arbitrary, capricious, not in accordance with law, in excess of statutory authority, and contrary to constitutional right, and vacate the PSLF Rule.

Dated: March 30, 2026

Respectfully submitted,

/s/ Cormac A. Early
Cormac A. Early (DC Bar No. 1033835)
Adina H. Rosenbaum (DC Bar No. 490928)
Adam R. Pulver (DC Bar No. 1020475)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

Aaron S. Ament (DC Bar No. 1602164)
Chris Bryant (DC Bar No. 1673495)
Eric Rothschild (DC Bar No. 1048877)
Daniel A. Zibel (DC Bar No. 491377)
National Student Legal Defense Network
1701 Rhode Island Avenue NW
Washington, D.C. 20036
(202) 734-7495

*Attorneys for Plaintiffs*